[Crim. No. 25477. Second Dist., Div. Five. June 3, 1975.]

THE PEOPLE, Plaintiff and Appellant, v.
GARY DALE ERNST et al., Defendants and Respondents.

## COUNSEL

Joseph P. Busch, District Attorney, Harry B. Sondheim, Eugene D. Tavris and Arnold T. Guminski, Deputy District Attorneys, for Plaintiff and Appellant.

Richard S. Buckley, Public Defender, Harold E. Shabo, Charles A. Maple, H. Reed Webb, Deputy Public Defenders, Richard E. Eldred, Wilson & Dunn and G. William Dunn for Defendants and Respondents.

## OPINION

**KAUS, P. J.**—Defendants Ernst, Williams, and Bodady were charged by information with a violation of Health and Safety Code, section 11355. After they were held to answer, the superior court granted their motions to set aside the information. The People appeal.

### FACTS

One Robert Hodge was working as a special employee for the Federal Narcotics Task Force. On September 27, 1973, Hodge, who had known Ernst socially before that time, told Ernst that he "had a market for cocaine" and asked Ernst if he knew anyone who could obtain cocaine. Ernst said that he did know people who could supply cocaine and offered to sell Hodge a pound for $17,000.

Hodge met again with Ernst that evening, when Ernst told Hodge that he had been in contact with "his people," and that he could not supply Hodge with a small sample of the cocaine which Hodge had requested, because the "people" with whom Ernst was dealing were not interested in breaking their supply of cocaine into small quantities.

Hodge then drove Ernst to a restaurant where he introduced him to another federal narcotics agent, one Dick Stuart. Ernst asked Stuart for

$3,000 as evidence of good faith before Ernst would continue the negotiations. Agent Stuart refused to give Ernst such a sum and told Ernst that $17,000 for a pound of cocaine was too high. Ernst, after making a telephone call, responded that he could not get it for anything less.

Later that evening, Hodge went back to Ernst's home and told Ernst that they were definitely interested in buying cocaine but they did not want to advance $3,000. Hodge said that Stuart did not want to pay $17,000 but "if worst came to worst" he would pay the amount. However, Stuart must "be assured of the right to examine the product before he paid the money."

The next day, September 28, Ernst met Hodge and Stuart at a restaurant. Stuart remained in the restaurant parking lot; he had the sum of $17,000 with him. Ernst spoke with Stuart alone and then told Hodge that the plan had been changed. The negotiations continued. Ernst had given a telephone number to Stuart, who apparently phoned Williams.

Later in the day, Hodge learned from Ernst that Williams was irritated because the transaction had not been consummated. Negotiations continued. At about 5 o'clock that day, Hodge went to Ernst's home and told him that the money had been put away in a deposit box and it was impossible to go through with the sale at that time.

Hodge then drove Ernst to Long Beach, where Hodge was introduced to Bodady. Ernst and Bodady told Hodge that they had cocaine in Bodady's apartment and that they were in the process of packaging it in preparation for a trip back East where they would sell it. About that time, Williams drove up. Hodge was asked for some "stick money" to hold the deal open until Monday. Hodge said he did not have any money with him and that he would have to speak with Stuart; he promised to call Ernst that night. Williams offered to sell Hodge a small quantity right then, but Hodge declined, stating that he had no money with him. Later that evening, Hodge called Ernst and told him that the deal would have to wait until Monday.

The next day, Sunday, Ernst told Hodge that he could conclude the deal on Monday, and instructed him to bring the money to Ernst's house where he would have the cocaine at 4 p.m.; that Hodge and his associates were to come there with the money, and "could sample the merchan-

dise." Ernst and his associates "could look at the money; and if we were satisfied, it would be a consummated transaction."

On Monday, Hodge arranged with Stuart that Stuart would call him at the Ernst residence about 10 minutes after Hodge had been dropped off there and that Hodge would use code words to indicate whether the cocaine was there and whether there were any firearms. Hodge then went to Ernst's house and they joined Williams in the kitchen. There was a substance on the kitchen table that Ernst and Williams represented to be cocaine. Williams asked Hodge if he was "going to try some of this cocaine." Hodge said "no," that he had to go to work. Williams then told Hodge to wet his finger, dip it in the powder and to rub it on his gums. Hodge complied and, after rubbing the powder on his gums, felt them go numb within a minute.

At some point, Stuart phoned Hodge. Shortly thereafter, Stuart and other federal agents arrived and arrested Ernst and Williams. They seized the substance on the kitchen table which was not cocaine or any other controlled substance.

## DISCUSSION

As noted, the information charged defendants with a violation of section 11355 of the Health and Safety Code.[1] Although the language of that section covers more ground,[2] its effect is sometimes summarized as making it a crime "to agree to sell a narcotic . . . , and then to deliver instead a non-narcotic substance." (See, e.g., *People* v. *Shephard,* 169

---

[1]The predecessor to section 11355 was section 11503 (Stats. 1959, ch. 1112, § 6, p. 3194; repealed Stats. 1972, ch. 1407, § 3, p. 2987) and the predecessor to that section was section 11502 (Stats. 1953, ch. 1770, § 2, p. 3526, repealed Stats. 1959, ch. 1112, § 1, p. 3193). The operative language in section 11355 has remained unchanged since 1959.

[2]Section 11355 reads in full: "Every person who agrees, consents, or in any manner offers to unlawfully sell, furnish, transport, administer, or give (1) any controlled substance specified in subdivision (b) or (c) of Section 11054, specified in paragraph (10), (11), (12), or (17) of subdivision (d) of Section 11054, or specified in subdivision (b) or (c) of Section 11055 or, (2) any controlled substance classified in Schedule III, IV, or V which is a narcotic drug to any person, or offers, arranges, or negotiates to have any such controlled substance unlawfully sold, delivered, transported, furnished, administered, or given to any person and then sells, delivers, furnishes, transports, administers, or gives, or offers, arranges, or negotiates to have sold, delivered, transported, furnished, administered, or given to any person any other liquid, substance, or material in lieu of any such controlled substance shall be punished by imprisonment in the county jail for not more than one year, or in the state prison for not more than 10 years."

Any interstices in the enumeration of the controlled substances contained in Schedules I, II, III, IV and V are filled by section 11382, which otherwise uses identical language in defining the offense.

Cal.App.2d 283, 289 [337 P.2d 214].) The trial court set aside the information because there "was no delivery, and, therefore, a necessary element of 11355 is missing."

▇ The offense defined by section 11355 consists of two elements: first, a "deal" to supply a controlled substance, and, second, some activity with respect to "any other liquid, substance, or material" in apparent consummation. Although semantically there are precisely 24 ways of satisfying the second element of the statute—e.g., "negotiating to have delivered"—defendants' position, obviously concurred in by the trial court, is that whatever the statute says, judicial interpretation has made an actual delivery of a noncontrolled substance essential. Judicial pronouncements in apparent support of that proposition are not lacking. Thus, in *People* v. *Shephard, supra,* 169 Cal.App.2d 283, 288-289, while holding that the predecessor section, then 11502, was not unconstitutionally vague, the court stated: "A reading of the section discloses that it is a crime for a person to agree to sell a narcotic to someone, and then to deliver instead a non-narcotic substance." In *People* v. *Hicks,* 222 Cal.App.2d 265, 271-272 [35 Cal.Rptr. 149], involving predecessor section 11503, in which another defendant contended that the section was unconstitutionally vague, the court ruled: "It is the delivery of a nonnarcotic that completes the crime." *Hicks* relied on and cited *Shephard.* (222 Cal.App.2d at p. 272.)

Several cases involving the issue of specific intent[3] have similarly stated or hinted that delivery is essential. In *People* v. *Northern,* 256 Cal.App.2d 28, 34 [64 Cal.Rptr. 15], the court said: "It seems clear that the precise situation which the [legislative] committee had in mind was one where the defendant was in a position to deliver a narcotic, . . . but then changed his mind and delivered a nonnarcotic substance. [¶] The section is violated if there is an offer of a narcotic and a subsequent delivery of a nonnarcotic substance." (*Id.* at pp. 34, 35) *People* v. *House,* 268 Cal.App.2d 922, 925 [74 Cal.Rptr. 496], quoting *People* v. *Northern, supra,* states that "[t]he section is violated if there is an offer of a narcotic and a subsequent delivery of nonnarcotic substance." And, most recently, in *People* v. *Medina,* 27 Cal.App.3d 473, 476 [103 Cal.Rptr. 721], the court, citing *People* v. *Hicks, supra,* 222 Cal.App.2d 265, stated that the important element is the delivery of a nonnarcotic.

---

[3] The issue of specific intent in connection with section 11382 (*ante,* fn. 2) is now pending before our Supreme Court in *People* v. *Haines* (Crim. No. 18394). The same issue involving other narcotic transactions is pending before that court in *People* v. *Daniels,* (Crim. No. 18316) and *People* v. *Mora,* (Crim. No. 18336). It is not involved in this appeal.

The People assert that since every cited case involved a completed delivery in its most technical sense—a transfer of possession—intimations that nothing short of such a delivery would save the statute from unconstitutionality were not necessary to the decisions and are, therefore, dicta.

Leaving that question temporarily unanswered, we note that a new statutory element has entered the picture. In 1972, when the Legislature enacted the Uniform Controlled Dangerous Substances Act (Health & Saf. Code, § 11000 et seq.; [Stats. 1972, ch. 1407, § 3]), it defined "deliver" or "delivery" to mean "the actual, constructive, or *attempted* transfer from one person to another of a controlled substance, whether or not there is an agency relationship." (Health & Saf. Code, § 11009. Italics added.)

Thus, at least as far as controlled substances are concerned, section 11009 equates attempted with actual deliveries. If we could interpret that section's reference to controlled substances to include other substances passed off as controlled substances, this case would be less troublesome, for unquestionably there was at least an attempted delivery to Hodge, unconsummated only because of "circumstances independent of the will of the attempter[s]," to wit, the arrival of the narcotic agents. (See *People* v. *Adami,* 36 Cal.App.3d 452, 455 [111 Cal.Rptr. 544]; cf. *People* v. *Camodeca,* 52 Cal.2d 142, 145-147 [338 P.2d 903].) To do so might, however, unnecessarily challenge accepted rules for construing penal statutes.[4] (See *Keeler* v. *Superior Court,* 2 Cal.3d 619, 632 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].) Nevertheless, it is legitimate to infer that the Legislature did not intend words used in the uniform act to be burdened with technical meanings applicable in other legal contexts. Having in mind that we are dealing with a statute which is designed to discourage "anyone from engaging or appearing to engage in the narcotics traffic" (*People* v. *Shephard, supra,* 169 Cal.App.2d at p. 288) rather than to define the contractual rights of the pusher and his

[4]The People argue that unless section 11009 is applied to section 11355 it is meaningless, for nowhere else in California's version of the uniform act does the word " 'deliver', or any of its semantic derivatives" appear in a context which would make the concept of an "attempted delivery" make sense. They appear to be correct, but the suggestion that the Legislature must actually have been thinking of section 11355 when enacting section 11009 is not supportable. Section 11009 was copied verbatim from section 101, subdivision (f), of the actual Uniform Controlled Substances Act, proposed in 1970. (See 9 Uniform Laws Annot., p. 145, et seq.) That act, however, contained no. counterpart of section 11355. It does, on the other hand, contain penal provisions such as section 401, which makes it unlawful to "manufacture, *deliver,* or possess with intent to manufacture or *deliver.* a controlled substance." (Italics added.) The matter seems to be one of legislative oversight. (Cf. *People* v. *Medina,* 15 Cal.App.3d 845, 848-849 [93 Cal.Rptr. 560].)

victim and that whatever "contracts" it deals with are not only illegal but, inevitably, unkept, does it really matter that technically there may not have been a delivery—a transfer of possession—because delivery and payment were, by the terms of the agreement, concurrent conditions? (*McDorman* v. *Moody,* 50 Cal.App.2d 136, 141-142 [122 P.2d 639]; Rest, Contracts, § 267.) Is it not equally beside the point that—again technically—there actually was a "tender of delivery" which under section 2507 of the California Uniform Commercial Code created a duty in Hodge to accept and pay for the "goods," at least if they had conformed to the contract?

■ We do not attempt to define the precise outlines of a delivery under section 11355. We merely hold that in view of the purpose of the act and the particular circumstances of this case—the apparent tender of the narcotic for which the parties had negotiated and the accepted invitation to sample an amount sufficient to satisfy the buyer—there was an adequate delivery to require defendants to plead to the information. Nor do we believe that our interpretation gives new life to the issue of uncertainty resolved in *People* v. *Shephard, supra,* 169 Cal.App.2d at pages 288-289.

■ Defendant Bodady makes the additional argument that his connection with the transaction was not sufficiently shown. The point has no merit. Admittedly, his participation was more peripheral than that of Ernst and Williams. Nevertheless, his involvement was such that there exists probable cause to believe that he aided and abetted his codefendants with respect to the entire transaction. Further, even if Bodady at all times contemplated a sale of genuine cocaine, he and the other two were engaged in a criminal conspiracy. Somewhere along the line Ernst and Williams may have decided to substitute an innocuous substance for the narcotic agreed on, assuming that this had not been their intention all along. If they did so pursuant to the original conspiracy, Bodady is responsible for any substantive crimes which were the "natural and reasonable or probable consequence of any act that he knowingly aided or encouraged." It is immaterial that the information did not charge a conspiracy. (*People* v. *Durham,* 70 Cal.2d 171, 181 [74 Cal.Rptr. 262, 449 P.2d 198].)

The order is reversed.

Stephens, J., and Ashby, J., concurred.

The petition of respondent Williams for a hearing by the Supreme Court was denied July 30, 1975.