[No. A050670. First Dist., Div. Two. May 6, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHNNY WAYNE HILL, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II and III.

COUNSEL

James W. Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Aileen Bunney and Stan M. Helfman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SMITH, J.—Sentenced to a midterm of two years in state prison, Johnny Wayne Hill appeals his jury trial conviction for selling a substance in lieu of the controlled substance cocaine (Health & Saf. Code, § 11355),[1] claiming error for failure to instruct on lesser related offenses, for misinstruction on eyewitness identification and for prosecutorial misconduct. We affirm.

### BACKGROUND

The conviction is for a sale of something resembling rock cocaine to undercover officer Janine Bakker of the Vallejo Police Department on May 31, 1989. The sale was part of a two-week drug buy operation focusing on street sales on the 1000 block of Grant Street in south Vallejo. Bakker was used to make the buys because she was new to the department (having worked for years beforehand as a deputy sheriff in another county) and was not known to street dealers.

Bakker drove slowly onto the block in an unmarked car about 9 p.m., near dusk, wearing plain clothes and a "body wire" which allowed other officers in the area to monitor her. She made eye contact with Hill, who stood at a driveway outside one of several apartment buildings on that side of the street. She stopped in the traffic lane. Hill walked up to the passenger side and tried to get in, but she motioned him to come around to her side,

---

[1]All further section references in this opinion are to the Health and Safety Code unless indicated otherwise.

Section 11355 provides (numbering ours) that "[e]very person who [1] agrees, consents, or in any manner offers to unlawfully sell, furnish, transport, administer, or give" specified controlled substances "to any person, or who offers, arranges, or negotiates to have any such controlled substance unlawfully sold, delivered, transported, furnished, administered, or given to any person and who [2] then sells, delivers, furnishes, transports, administers, or gives, or offers, arranges, or negotiates to have sold, delivered, transported, furnished, administered, or given to any person any other liquid, substance or material in lieu of any such controlled substance shall be punished by imprisonment in the county jail for not more than one year, or in the state prison."

which he did. She said "[W]hat's happening," and Hill asked, "What do you want?" She said that she wanted a "2-O," a street term in that area meaning a $20 rock of cocaine.

Hill reached into his pants, pulled out a closed fist, held it up to the top, open part of Bakker's window, palm-side down, and asked to see the money. Bakker had a marked $20 bill which she held up "kind of away" from the window to show him. When he tried to reach in and grab it with his left hand, she pulled it away, saying, "[N]o, no, let me see it first." Hill, by now agitated and angry, demanded, "[C]ome on girl, hurry up, cops are around." Bakker held up her hand, into which Hill dropped "a white powdery, hard, compacted rock-like substance" which appeared to be rock cocaine. She then handed him the $20 bill. He left, walking around the rear of the car back toward the driveway.

Bakker uttered a code signal "Thank you" and drove off, radioing Hill's direction and a description of him as an adult male Black, dark complected, in his late 20's or early 30's, tall, thin and wearing a black baseball cap with "Arizona" in red letters on it, a red long-sleeved shirt, black pants and white tennis shoes. According to plan, she then drove on to a "meet spot," where she got into the back of an undercover car driven by Officer Kevin Cosgrove, who had monitored her.

Meanwhile, a "detention team" led by Officer Larry Giles moved in and, on the pretext of looking for a robbery suspect, stopped a man in front of a two-building apartment complex at 1007-1015 Grant. Giles had seen Hill standing in front of 1003 Grant as he arrived but went to the other address thinking that it was the one referred to by Bakker. On the pretext of doing a showup for a local robbery, Giles stopped the man and had Cosgrove drive Bakker to the scene. Seeing from the backseat of the car that the man was similarly dressed but older, heavier, capless and wearing black shoes, Bakker said he was *not* the one. Cosgrove drove her a block or so away to await further word.

Giles went to 1003 Grant, where he had seen Hill about four or five minutes earlier. Giles knocked, and a Black woman known to him as Michelle answered. Asked if anyone had recently entered the apartment, she said only she and her two children were inside but that he could look anyway. Giles and two other officers (Jacksch and Ketchum) entered to find Hill lying awake on a bed in a bedroom. A search of other rooms disclosed no one but the children. Hill was pat-searched for weapons, but no further search was made. No effort was made to find the marked $20 bill. Hill was dressed like the person Bakker had described except for the black cap with

"Arizona" in red. Such a cap was found lying out on top of other clothes in a plastic laundry basket next to the bed, as if tossed there. Hill denied that the cap was his. Again using the robbery pretext, officers got Hill's consent to go out on the front porch and put the cap on him. Bakker was driven by and made a positive identification from the car. Hill was falsely told that he was not the one they wanted (and was evidently arrested later).

The robbery pretext, the in-car identification (with Bakker hunched down under a coat), the false assurance to Hill and the lack of any search for the marked bill were explained as measures taken to protect the ongoing buy program, which had evidently netted some 10 arrests by then. Officers testified that there was enough artificial lighting to allow a good look at both suspects.

Tests of the cocaine-like substance, it was stipulated, revealed no controlled substances.

The defense was alibi. Hill conceded being at the apartment and knowing of prevalent drug sales in the area but denied selling anything. He also contradicted the officers in some ways concerning what took place in the apartment. Defense counsel focused on possible misidentification, stressing lack of photos, videotape or the marked $20 bill.

APPEAL

I

Hill requested but was refused instructions on petty theft by false pretenses (Pen. Code, § 484) and distribution of an imitation controlled substance (§ 11680), both misdemeanors, which he urged were lesser related offenses requiring instruction under *People* v. *Geiger* (1984) 35 Cal.3d 510 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055] (*Geiger*). We find no error.

*Geiger* established three prerequisites to receiving requested instruction on lesser related offenses. First, there "must be the existence of some basis, other than the unexplainable rejection of prosecution evidence, on which the jury could find the offense to be less than that charged. [¶] Second, the offense must be one closely related to that charged and shown by the evidence. . . . [¶] Finally, the instruction must be justified by the defendant's reliance on a theory of defense that would be consistent with a conviction for the related offense." (*Geiger, supra,* 35 Cal.3d 510, 531.)

*Petty theft by false pretenses*

The crime of theft for obtaining property by false pretenses requires (1) a false pretense or representation, (2) made with intent to defraud the

owner and (3) the owner parting with the property in reliance on the misrepresentation. (*Perry* v. *Superior Court* (1962) 57 Cal.2d 276, 282-283 [19 Cal.Rptr. 1, 368 P.2d 529]; *People* v. *Smith* (1984) 155 Cal.App.3d 1103 [203 Ca.Rptr. 196], 1146, cert. den. (1985) 469 U.S. 1160 [83 L.Ed.3d 924, 105 S.Ct. 910].)

 We hold that this offense was not "closely related" to the charged offense under *Geiger*. *Geiger*'s discussion of this element explored the watershed case, *United States* v. *Whitaker* (D.C. Cir. 1971) 447 F.2d 314 [144 App.D.C. 344] (*Whitaker*), which inspired much of the opinion. Rejecting a more restrictive approach taken in *Whitaker*, *Geiger* concluded: "[T]he offense must be one closely related to that charged and shown by the evidence. The District of Columbia Circuit and the courts adopting the *Whitaker* approach have limited instructions to those on offenses having an 'inherent relationship' with the charged offense in order to prevent 'abuse' by defendants seeking to appeal to the jury's sense of mercy by requesting instructions on every offense that is arguably shown by the evidence.[2] We agree that the right to instructions on related offenses is not without limit. The purpose of the rule, however, serves to define its limits. The right to instructions on related offenses exists only to enable the jury to determine fairly the issues presented by the evidence and in so doing to avoid any incentive to convict the defendant of a greater offense than that which he committed. The issues presented by the evidence are those related first to the defendant's guilt or innocence of the charged offense. Although some evidence offered by the People or the defendant may indicate that the defendant has committed a crime other than that charged, instructions regarding that crime need not be given unless the evidence is also relevant to and admitted for the purpose of establishing whether the defendant is guilty of the charged offense." (*Geiger, supra*, 35 Cal.3d 510, 531.)

*Geiger* thus declined to adopt the full restrictive language of *Whitaker* (fn. 2, *ante*). It did not, however, shun the requirement that, to be "closely related," a lesser related offense must serve a societal interest like the one served by the charged crime. This is clear from the court's holding that the

---

[2]*Geiger* had earlier quoted this qualifying language from *Whitaker*: " '[T]here must also be an "inherent" relationship between the greater and lesser offenses, *i.e.*, they must relate to the protection of the same interests, and must be so related that in the general nature of these crimes, though not necessarily invariably, proof of the lesser offense is necessarily presented as part of the showing of the commission of the greater offense. This latter stipulation is prudently required to foreclose a tendency which might otherwise develop towards misuse by the defense of such rule. In the absence of such restraint defense counsel might be tempted to press the jury for leniency by requesting lesser included offense instructions on every lesser crime that could arguably be made out from any evidence that happened to be introduced at trial.' " (447 F.2d 314, 319, fn. omitted; *Geiger, supra*, 35 Cal.3d 510, 521.)

defendant in that case was entitled to instruction on vandalism as a lesser related offense to the charged crime of burglary: "The offense of vandalism is related to burglary since it is made an offense to protect the same societal interest—security of property—as burglary. It is often proven by the evidence that is offered to prove burglary." (*Geiger, supra*, 35 Cal.3d 510, 532.)

Divergent societal interests defeated any right to lesser related offense instruction in *People* v. *Boyd* (1985) 167 Cal.App.3d 36 [212 Cal.Rptr. 873]. "Attempted possession of cocaine is not closely related to the charge of armed robbery. The societal interest in proscribing robbery—security of personal property from a felonious taking—has no relationship to the societal interest in proscribing the possession of narcotics—elimination of a dangerous substance the use of which represents a serious risk to the health and welfare of the appellant and perhaps others who might come into unlawful possession thereof. [¶] Likewise, the societal interest to be protected by proscribing an assault with a deadly weapon (Pen. Code, § 245) or exhibiting a firearm (Pen. Code, § 417) is security of the person, not security of personal property from a felonious taking, which underlies robbery. These crimes are not closely related." (*Id.*, at p. 47.)

■ Here, too, the societal interests protected by the lesser related and charged offenses are disparate. Petty theft by false pretenses protects against the fraudulent deprivation of property. Section 11355, which in essence proscribes, first, the making of "a 'deal' to supply a controlled substance, and, second, some activity with respect to 'any other liquid, substance, or material' in apparent consummation" (*People* v. *Ernst* (1975) 48 Cal.App.3d 785, 790 [121 Cal.Rptr. 857]), may superficially appear aimed at fraud or deceit. However, its true aim is to discourage anyone from engaging or appearing to engage in drug traffic (*People* v. *Medina* (1972) 27 Cal.App.3d 473, 477 [103 Cal.Rptr. 721]). " 'The vice which the statute attacks is one aspect of the narcotics traffic, not fraud or breach of contract.' " (*Id.*, at p. 478, quoting *People* v. *Northern* (1967) 256 Cal.App.2d 28, 34 [64 Cal.Rptr. 15].) Such transactions, in fact, are illegal (*People* v. *Ernst, supra*, 48 Cal.App.3d at pp. 791-792) and therefore *against* public policy to protect.

Hill was prosecuted, in other words, for promoting the drug trade, not for bilking an undercover officer out of $20. He was not entitled to instructions on petty theft since that offense was not "closely related" to the charged one.

*Distributing an imitation controlled substance*

Section 11680, part of the California Imitation Controlled Substances Act (§ 11671 et seq.), provides: "Any person who knowingly manufactures,

distributes, or possesses with intent to distribute, an imitation controlled substance is guilty of a misdemeanor . . . ." ▮ The People urge that the act's legislative findings and definition of "imitation controlled substance" show a limited intent to deter "the proliferation of imitations or counterfeits of drugs which otherwise may be lawfully obtained by prescription"—a scope which obviously would not encompass rock cocaine. The argument is essentially an attack on two *Geiger* prerequisites: (1) the offense serves dissimilar purposes and so is not "closely related"; (2) there was no evidence here of an "imitation controlled substance" in the contemplation of the act.

The legislative findings do provide some support for a limited intent. Uncodified language in the legislation speaks of stemming a proliferation of "capsules and tablets" which are "carefully designed to resemble or duplicate the appearance of brandname amphetamines, barbiturates, tranquilizers, and narcotic pain killers." These counterfeits are known on the street by their "dangerous drug counterparts" yet contain caffeine, appetite suppressants, decongestants and similar substitutes. Users, typically teenagers, risk harm from the imitations themselves or, once they grow accustomed to an imitation's milder effects, from taking noncounterfeit drugs in excessive doses.[3]

---

[3]"SECTION 1. The Legislature finds and declares as follows:

"(a) Early in 1980 distributors began flooding the nation with capsules and tablets known as 'imitation controlled substances.'

"(b) Imitation controlled substances are carefully designed to resemble or duplicate the appearance of brandname amphetamines, barbiturates, tranquilizers, and narcotic pain killers. On the street, they are known by the same name as their dangerous drug counterparts. Yet the drugs contain no controlled substances, and in fact, usually contain legal over-the-counter drugs, including caffeine, phenylpropanolamine (an appetite suppressant and nasal deconges-tant), ephedrine (a decongestant), pseudoephedrine, or some combination thereof.

"(c) The easy availability of imitation controlled substances has encouraged a climate of acceptance among many teenagers and has conditioned them to the daily trafficking, han-dling, and consumption of these 'pharmacal stimulants.' In many places, imitation controlled substances have become a part of the drug culture.

"(d) As the abuse of imitation controlled substances grew, the public health dangers of these substances quickly became apparent. The young consumer who thinks that he or she has been purchasing 'speed' or 'ludes' and has become used to taking several imitation controlled substances capsules or tablets at a time in order to 'get the full effect' runs the risk of serious overdose or death if one day he or she ingests the same number of real controlled substances. In addition, the imitation controlled substances themselves can have serious damaging effects, especially in combination with alcohol or other drugs. The number of emergency room incidents attributable to these drugs has risen dramatically. More than a dozen deaths caused by imitation controlled substances have been reported from around the country. More deaths from caffeine overdose and emergency room hypertensive incidents from severe reactions to phenylpropanolamine may have occur[r]ed but gone unreported.

"(e) Although trafficking in imitation controlled substances is not prohibited by the federal Controlled Substances Act, the Drug Enforcement Administration considers that the distribution and sale of imitation controlled substances encourages and contributes to drug

However, whatever the motivation for the act, the codified language actually used covers a far broader spectrum. Section 11675 states: " 'Imitation controlled substance' means (a) a product specifically designed or manufactured to resemble the physical appearance of a controlled substance, such that a reasonable person of ordinary knowledge would not be able to distinguish the imitation from the controlled substance by outward appearances, or (b) a product, not a controlled substance, which, by representations made and by dosage unit appearance, including color, shape, size, or markings, would lead a reasonable person to believe that, if ingested, the product would have a stimulant or depressant effect similar to or the same as that of one or more of the controlled substances included in Schedules I through V, inclusive, of the Uniform Controlled Substances Act, pursuant to Chapter 2 (commencing with Section 11053) of Division 10." The language "dosage unit appearance" suggests, but is not limited to, pills or tablets or imitations of "prescription" drugs. The sweeping inclusion of full Uniform Controlled Substances Act schedules, in fact, seemingly includes imitations of any such drugs, including cocaine (§ 11055, subd. (b)(6)) and cocaine base (§ 11054, subd. (f)(1); see also *People* v. *Howington* (1991) 233 Cal.App.3d 1052, 1056-1059 [284 Cal.Rptr. 883] [discussing the uncodified term "rock cocaine"]), as does the definition of controlled substance, also taken from the other act (§§ 11007, 11672).

Thus there is substantial evidence that the substance handed to the officer in this case was an imitation controlled substance. It looked like rock cocaine and was impliedly sold as such in response to the officer asking for a "2-O," a street term meaning a $20 rock of cocaine.

Nor does it appear that the societal interests behind the two acts differ enough that the two offenses should not be deemed "closely related." The Uniform Controlled Substances Act penalizes in-lieu sales, not because they involve fraud against the buyer, but because they promote drug trafficking and its attendant dangers. (*People* v. *Ernst, supra*, 48 Cal.App.3d 785, 790-791; *People* v. *Medina, supra*, 27 Cal.App.3d 473, 477-478.) The Imitation Controlled Substances Act has a similar purpose. It discourages the use and proliferation of counterfeit drugs which can themselves be dangerous, have become part of the drug trafficking culture, encourage and contribute to drug abuse and profiteering, and expose users to overdoses on the drugs which they imitate. (Fn. 3, *ante.*) The interests being protected are

---

abuse and drug profiteering. The problem is one more facet of the nationwide drug abuse problem.

"(f) More than a dozen states have enacted or are considering legislation targeted against the manufacture and distribution of imitation controlled substances. Cities and counties have passed local ordinances prohibiting storefront imitation controlled substances sales." (Stats. 1982, ch. 1288, § 1, pp. 4763-4764.)

substantially the same. In fact, this case exposes a redundant overlap between them.[4] We therefore cannot sustain the ruling below on basis that the offenses are not "closely related," the second *Geiger* prerequisite.

■ However, we sustain the ruling on a more fundamental policy basis: *Geiger* simply does not apply to this case, even if all three of its prerequisites had been satisfied below.

In this unusual case, the misdemeanor distribution offense for which Hill sought instruction was "lesser" only in terms of penalty. Its elements so closely resembled those of the charged in-lieu sale that trial counsel would have had to urge jurors to *accept*, not reject, evidence of the greater offense but return a verdict only on the lesser. In fact, the "lesser" in this case required that Hill *knowingly* distribute an "imitation controlled substance" (§ 11680), whereas, given the fact that the in-lieu substance in this case was *sold* (not just *offered* for sale), no knowledge of the sold substance's composition was required for the greater offense (*People* v. *McDaniel* (1979) 24 Cal.3d 661, 669-670 [156 Cal.Rptr. 865, 597 P.2d 124]; § 11355). The lesser, in other words, required belief of all of the evidence proving the greater *plus* an added scienter element. A lesser offense in this situation is not one to which *Geiger* applies.

■ *Geiger* announced the right to lesser-related-offense instructions not to guarantee a defendant a shot at the least possible punishment for his conduct, but to ensure the reliability of the factfinding process and protect the reasonable doubt standard against compromise. "Procedures necessary to ensure reliability in the fact finding process when the state participates in the deprivation of personal liberty are required by due process. (Cal. Const., art. I, § 15; *Salas* v. *Cortez* (1979) 24 Cal.3d 22, 33 . . . , cert. den., 444 U.S. 900 . . . ; *In re Roger S.* (1977) 19 Cal.3d 921, 937 . . . .) Instructions on lesser offenses are required because a procedure which affords the trier of fact no option other than conviction or acquittal *when the evidence shows that the defendant is guilty of some crime but not necessarily the one charged,* increases the risk that the defendant may be convicted notwithstanding the obligation to acquit if guilt is not proven beyond a reasonable doubt. The pressures which create that risk thus affect the reliability of the fact finding process and thereby undermine the reasonable doubt standard." (*Geiger, supra,* 35 Cal.3d 510, 520, italics added.)

■ It follows from that rationale that where a lesser offense would require the jury to *believe*, not doubt, *all* of the same evidence which would

---

[4]This overlap between felony and misdemeanor statutes is puzzling, and the legislative findings behind section 11680 (fn. 3, *ante*) suggest that it was not anticipated or intended. We urge the Legislature to look at the statutes and make appropriate revisions.

prove him guilty of the charged offense, giving the lesser offense instruction does nothing to safeguard the reasonable doubt standard. Here, to return a verdict of guilty for misdemeanor distribution would require jurors to accept all of the same evidence on which they would find Hill guilty of the greater offense, the in-lieu sale, plus a scienter element not even required for the greater. If Hill was guilty of the lesser, on these facts, he was also guilty of the greater. Denying the lesser-offense instruction therefore did not offend *Geiger*. The same rationale applies to lesser *included* offenses, which require instruction " 'only if there is substantial evidence to support a jury's determination that the defendant was in fact *only* guilty of the lesser offense.' [Citation.]" (*People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 127 [2 Cal.Rptr.2d 335, 820 P.2d 559].)

The dissent disregards those policy underpinnings, obfuscating the issue with talk of "ambiguity" which must be resolved in a defendant's favor. His apparent concern is with "ambiguity" over whether the Legislature intended Hill's conduct in this case to be punished as a felony or a misdemeanor. However, this is an issue raised by no party and is utterly beside the point. *Geiger* is concerned with instructing jurors so as to safeguard the reasonable doubt standard and the integrity of the factfinding process. Resolving ambiguities of legislative intent is obviously not a function of the jury, and nothing in *Geiger* remotely suggests that it is. Statutory interpretation poses purely legal questions, as the cases cited in the dissent show. (*People* v. *Davis* (1981) 29 Cal.3d 814, 828-829 [176 Cal.Rptr. 521, 633 P.2d 186] [whether a statute allowed imprisonment of a minor for life without the possibility of parole]; *In re Tartar* (1959) 52 Cal.2d 250, 256-257 [339 P.2d 553] [whether a statute required allegation and proof of prior prison terms].)

█ Finally, an alternative argument raised below was that Hill's theory of defense at trial—alibi or mistaken identity—was not consistent with the lesser related offense, *Geiger*'s third prerequisite. The argument has merit.

█ *Geiger* holds that lesser related offense instruction "must be justified by the defendant's reliance on a theory of defense that would be consistent with a conviction for the related offense. Thus, the instruction need not be given if the defense theory and evidence reflect a complete denial of culpability as when the defense is alibi, or the only issue is identity, *unless the defendant argues that the evidence at most shows guilt only of the related offense.*" (*Geiger, supra,* 35 Cal.3d 510, 531-532, fn. deleted and italics added.)

It has been held that this does not literally require defense counsel to risk sanctions by arguing for an offense on which instruction may already have

been denied. It does, however, at least require counsel to argue for reasonable doubt on some basis beyond alibi. (*People* v. *Woods* (1991) 226 Cal.App.3d 1037, 1050-1051 [277 Cal.Rptr. 269] [alibi defense to murder held consistent with aggravated assault where counsel argued alternatively that intent to kill was lacking]; but see *People* v. *Richmond* (1991) 2 Cal.App.4th 610, 618 [3 Cal.Rptr.2d 252] [finding "[the *Woods*] logic difficult to follow"]; see also *People* v. *White* (1986) 185 Cal.App.3d 822, 829-830 [231 Cal.Rptr. 569] [misidentity defense to murder held consistent with being an accessory where counsel alternatively argued that the evidence showed accessory guilt at most].) *Geiger* thus may allow the defense to ride two horses, but it must ride both in front of the jury.

Hill's *only* defense at trial was misidentification. He testified that he was in front of and inside 1003 Grant but never sold to the undercover officer, and his counsel never offered anything to the jury *but* mistaken identity. In fact, she *conceded* that an in-lieu sale was made and asked the jury only to question who made it. She told the jurors: "Now, we don't have any dispute that a sale in lieu of was made here. Someone came up to her car. They exchanged a marked $20 bill for what looked to be a piece of rock cocaine, and I'm sure that that incident happened and that Miss Bakker participated in it. [¶] We don't have any dispute with that. [¶] The issue here in this case, and that you all need to consider is who that person was that participated in that sale."

Only in argument to the *court*, while settling instructions out of the jury's presence, did counsel raise any doubt about the object of the deal or either party's intent. She suggested then that the defense could "argue in the alternative" both identity and lack of the charged offense, but she did not carry through with that plan before the jury.

Hill assumes that argument to the court was enough. We disagree. First, his position would make *Geiger*'s third "prerequisite" redundant. All one would have to do is show evidentiary support for a closely related lesser offense; merely requesting the instruction would show implicit "reliance" on a consistent "theory of defense." The dissent evidently embraces this groundless blurring of two *Geiger* elements. We do not.

Second, making argument to the court enough would give alibi defendants greater rights than those who concede presence but otherwise inconsistently defend. (*People* v. *Moore* (1990) 224 Cal.App.3d 234, 238-239 [273 Cal.Rptr. 680] [defense to gun possession by felon held inconsistent with brandishing where the defense conceded presence but claimed a *brother* held the gun]; *People* v. *Simpson* (1987) 192 Cal.App.3d 1360, 1370-1371 [237

Cal.Rptr. 910] defense to aggravated assault held inconsistent with battery where defense conceded presence but denied any use of force], 1376 [opn. by White, P. J., conc. on that point]; *People* v. *Boyd, supra,* 167 Cal.App.3d 36, 47-48 [robbery defense of not robbing or using a gun held inconsistent with aggravated assault and exhibiting a firearm].)

Third, argument to the court alone goes beyond *Geiger's* rationale. Lesser related offenses, which give jurors an option between conviction or acquittal of the charged offense, safeguard the reasonable doubt standard when the defense disputes some element of the charge before the jury. Lack of a middle ground option in that situation could tempt jurors to compromise the reasonable doubt standard and convict anyway. (*People* v. *Moore, supra,* 224 Cal.App.3d 234, 238-239.) However, where the *only* dispute presented to jurors is identity or alibi, all the lesser-offense options in the law cannot help them resolve it. Thus any dispute about the charged offense on its merits must be argued *to the jury,* whose duty it is to consider reasonable doubt whether the elements are present.

 There is no unfairness in asking a defendant who relies on alibi, and wants lesser-related instruction, to alternatively attack the sufficiency of the evidence supporting the charged offense. The unfairness perceived by the dissent rests entirely on his peculiar premise that *Geiger* instruction is a remedy for legislative "ambiguity" where given conduct might be punishable as both a misdemeanor and a felony. Such "ambiguity" is common in the criminal law, yet no case has ever suggested that it is a court's duty to wrest charging discretion from the prosecutor as a solution. *Geiger* allows interference with the prosecutor's power only when the lack of a lesser-offense option risks juror compromise because "the defendant is guilty of some crime but not necessarily the one charged . . . ." (*Geiger, supra,* 35 Cal.3d 510, 520; see also *id.,* at pp. 533-534, dis. opn. by Richardson, J.; cf. *People* v. *Bacigalupo, supra,* 1 Cal.4th 103, 127.) Here, Hill was *necessarily* guilty of the greater if guilty of the lesser. The dissent offers no reason at all why *Geiger* should apply where its due-process rationale does not.

Nor is the defense excused from presenting jury argument consistent with a lesser related offense when the trial court, as here, refuses a request for *Geiger* instructions *before* arguments begin. Instructions are proposed and usually settled before arguments begin (Pen. Code, § 1093.5), and the court in its discretion often gives jurors some preinstruction beforehand (*People* v. *Lamb* (1988) 206 Cal.App.3d 397, 399-400 [253 Cal.Rptr. 465]; *People* v. *Valenzuela* (1977) 76 Cal.App.3d 218, 220-221 [142 Cal.Rptr. 655]; Pen. Code, §§ 1093, 1094). This does not mean, however, that *Geiger* instructions cannot be settled or perhaps in some cases even first requested after arguments have begun. Penal Code section 1094 gives the court broad discretion

to depart from the usual prescribed order of trial, and Penal Code section 1093.5 seems tailor-made for *Geiger* problems of reliance. After providing that instructions must be proposed and, on request of counsel, settled before jury arguments commence, it adds: "However, if, during the argument, issues are raised which have not been covered by instructions given or refused, the court may, on request of counsel, give additional instructions on the subject matter thereof." A court has discretion under that section, and in its general authority to control the order of trial (Pen. Code, § 1094), to defer ruling on lesser-related instructions until argument or to consider a renewed request after defense counsel shows reliance, during argument, on a defehse theory consistent with the lesser related offense.

*Geiger* instruction on misdemeanor distribution was properly refused.

## II, III*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Benson, J., concurred.

**KLINE, P. J.,** Dissenting.—The trial court's refusal to instruct on misdemeanor distribution of an imitation controlled substance (Health & Saf. Code, § 11680)[1] is, in my view, reversible error.

## I.

The majority concludes that instructions on misdemeanor distribution of an imitation controlled substance (§ 11680) were not required even though this lesser related offense is "closely related" to the charged offense (§ 11355) within the meaning of *People* v. *Geiger* (1984) 35 Cal.3d 510, 531 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055]. This is so, the majority reasons, because "the misdemeanor distribution offense for which Hill sought instruction was 'lesser' only in terms of penalty. Its elements so closely resembled those of the charged in-lieu sale that trial counsel would have had to urge jurors to *accept,* not reject, evidence of the greater offense but return a verdict only on the lesser." (Maj. opn., *ante,* p. 44, italics in original.) In other words, denying the lesser related offense instruction does

---
*See footnote, *ante,* page 33.
[1] All statutory references are to the Health and Safety Code unless otherwise indicated.

not offend *Geiger* because "If Hill was guilty of the lesser, on these facts, he was also guilty of the greater." (*Id.*, at p. 45.)

The theory that *Geiger* does not apply to offenses so similar to the charged offense that the only difference is the penalty—a theory never advanced by the People—turns *Geiger* on its head. To say that *Geiger* does not apply to an admittedly related offense shown by the evidence because it is lesser than the charged offense "only in terms of penalty" renders the reason the defendant wishes to invoke it the basis for excluding it. If a related offense is not within *Geiger* "merely" because it prescribes a lesser penalty, what then is necessary to bring such an offense within the rule? The requirement, my colleagues apparently believe, is that it not be *too* closely related to the offense charged by the district attorney. This is an unreasonable corruption of *Geiger*. The assignment by the Legislature of different penalties for what appears to be the same conduct justifies greater, not lesser, protection of the sort *Geiger* provides.

The majority's analysis is not only unreasonable, but has the effect of depriving a criminal defendant of a conventional entitlement. " '[W]hen language which is reasonably susceptible of two constructions is used in a penal law ordinarily that construction which is more favorable to the offender will be adopted. [¶] The defendant is entitled to the benefit of every reasonable doubt, whether it arise out of a question of fact, or as to the true interpretation of words or the construction of language used in a statute.' " (*People* v. *Davis* (1981) 29 Cal.3d 814, 828 [176 Cal.Rptr. 521, 633 P.2d 186], quoting *In re Tartar* (1959) 52 Cal.2d 250, 256-257 [339 P.2d 553].) A single criminal offense punishable under one statute as a felony or a misdemeanor and under another statute only as a misdemeanor cannot be punished as a felony without depriving the defendant of the doubt as to which punishment the Legislature intended. Refusing to resolve the admitted ambiguity in the law in favor of criminal defendants, the majority instead defers to the charging decision of the district attorney.

The majority incorrectly ascribes to me the view that it is the function of the jury to resolve "ambiguities of legislative intent." (Maj. opn., *ante*, at p. 45.) I agree that the resolution of such ambiguity is a judicial function. My point is that the use of ambiguity to justify refusal to instruct on a lesser related offense indisputably shown by the evidence is an unwarranted abdication of judicial responsibility. The ambiguity is the *source* of the duty, not the reason it need not be discharged.

II.

The majority says that "where the *only* dispute presented to jurors is identity or alibi, all the lesser-offense options in the law cannot help them

resolve it." (Maj. opn., *ante*, at p. 47, italics in original.) The error in this claim—which is the fundamental flaw of the entire majority opinion—is the idea that the parameters of the "dispute" in a criminal case are defined solely by the prosecution. If that were true there would be no right to instructions on lesser offenses in the first place, and *Geiger* would never have been decided. But it is not true.

What was said in *People v. Tenorio* (1970) 3 Cal.3d 89 [89 Cal.Rptr. 249, 473 P.2d 993] with respect to the right of the court to dismiss allegations of prior convictions over the objection of the prosecutor applies with even greater force to the judicial duty to instruct, which the Legislature has never even attempted to subject to the power of the prosecutor. *Tenorio* holds that the Legislature cannot grant the prosecutor the unreviewable power to deprive the superior court of the power to strike priors, because " 'Constitutional jurisdiction of the court to act cannot be turned on and off at the whimsy of either the district attorney or the Legislature.' " (*Id.*, at p. 93, quoting Justice Schauer's dissenting opinion in *People v. Sidener* (1962) 58 Cal.2d 645, 652, 654 [25 Cal.Rptr. 697, 375 P.2d 641], which was adopted in *Tenorio* by a unanimous court.) That is precisely what the majority has done in this case; without even the dubious benefit of the Legislature's urging, the majority has permitted the charging power of the district attorney to deprive the trial judge of the power to instruct on a lesser related offense, for the illogical reason that the prosecutor, rather than the defendant, has introduced the evidence that would support conviction of such an offense.

The majority says appellant "was *necessarily* guilty of the greater if guilty of the lesser" (maj. opn., *ante*, at p. 47, italics in original); and claims I offer "no reason at all why *Geiger* should apply where its due-process rationale does not." (*Ibid.*) The reason, I hope it is clear, is that while appellant may in an abstract sense be "guilty" of both the greater and the lesser offenses, he cannot be convicted of both. Unlike my colleagues, I believe it is the jury, not the prosecutor, that has the right to make that decision. It was deprived of that right in this case by the erroneous refusal of the trial court to instruct on the lesser related offense.

### III.

In effect, the majority concludes that appellant's failure to ask the jury to find him guilty of misdemeanor distribution if it disbelieved his alibi provides a basis for sustaining the trial court's refusal to instruct on that offense.

Clearly, the only reason appellant did not present to the jury the alternative defense of misdemeanor distribution—ample evidence of that offense

having been supplied by the prosecution—was that he was erroneously prevented from doing so by the trial court.

In *People* v. *Woods* (1991) 226 Cal.App.3d 1037 [277 Cal.Rptr. 269] the defendant was convicted of second degree murder and two counts of attempted murder. One of the questions on appeal was whether the trial court committed prejudicial error by refusing to instruct on assault with a deadly weapon as a lesser related offense of the attempted murder. The Attorney General claimed the trial court correctly refused to give this instruction because the defendant merely attacked the sufficiency of the prosecution's evidence of actual intent to kill and did not explicitly point out that the evidence amounted to no more than assault with a deadly weapon. In conditionally reversing the conviction of attempted murder, the Court of Appeal rejected this argument. (*Id.*, at p. 1051.) "To expect defense counsel to more fully argue the theory of the lesser related offense after being told the instruction would not be given would be to ask that lawyer to engage in improper conduct. In essence, in making that argument, the defense counsel would be asking the jury to go outside the law as presented by the trial court. In all probability, had he done so the prosecutor would have objected on that very ground. Undoubtedly the judge would have sustained that objection and admonished the jury to disregard any words along these lines which the defense counsel might have uttered before the prosecutor's objection." (*Ibid.*)

There is in this case much stronger evidence of misdemeanor distribution of an imitation controlled substance than there was in *Woods* of assault with a deadly weapon. Indeed, at the trial in this case, the district attorney explicitly conceded that appellant "certainly knowingly distributed an imitation controlled substance," and could therefore be convicted under section 11680. The only conceivable reason appellant sought an instruction on that offense was so that he could persuade the jury to find him guilty of it if the jury disbelieved his alibi. The trial court's erroneous refusal of the instruction prevented appellant from making the argument the majority deems essential. Appellant is thus placed in a "Catch-22."

The majority contends it would make *Geiger*'s reliance requirement "redundant" if "merely requesting the instruction would show implicit 'reliance' on a consistent 'theory of defense.'" (Maj. opn., *ante*, at p. 46.) This argument ignores the most distinctive feature of this case. While the mere request for an instruction would not *ordinarily* suffice to show the reliance that *Geiger* requires it certainly suffices where, as here, it is undisputed that the *prosecution's* evidence would support a conviction of the lesser offense for which an instruction was requested. This presented an obvious problem

for the district attorney. His objection to the requested instruction, very different from that offered up by my colleagues, was based on *People* v. *Acevedo* (1985) 166 Cal.App.3d 196 [212 Cal.Rptr. 328], in which it was held "that disbelief of all or part of the prosecution case does not require instruction on lesser included offenses . . . ." (*Id.*, at p. 201.) *Acevedo* has no bearing on the present case. Appellant's alternative defense does not depend on the jury's disbelief but its *belief* of all or part of the prosecution's case. Permitting appellant to rely on prosecution evidence as an alternative to his alibi defense certainly does not present the problem the *Acevedo* court was concerned about. The Attorney General concedes as much, as he does not advance the district attorney's theory on this appeal.

The majority is wrong in saying that "[t]here is no unfairness in asking a defendant who relies on alibi, and wants a lesser-related instruction, to alternatively attack the sufficiency of the evidence supporting the charged offense." (Maj. opn., *ante*, p. 47.) The unfairness I perceive does not, as the majority claims, rest "on [my] peculiar premise that *Geiger* instruction is a remedy for legislative 'ambiguity' where given conduct might be punishable as both a misdemeanor and a felony." (Maj. opn., *ante*, at p. 47.) My perception of unfairness rests on the firm belief that, as I have said, it is an unjust "Catch-22" to require a defendant to attack the sufficiency of prosecution evidence that he seeks to rely upon.

## IV.

The trial court's refusal to instruct on misdemeanor distribution forced the jury into the all-or-nothing choice that in similar situations has repeatedly been condemned by our Supreme Court. (*People* v. *Ramkeeson* (1985) 39 Cal.3d 346, 352 [216 Cal.Rptr. 455, 702 P.2d 613]; *People* v. *Geiger, supra,* 35 Cal.3d 510, 519-520; *People* v. *Wickersham* (1982) 32 Cal.3d 307, 324 [185 Cal.Rptr. 436, 650 P.2d 311].) Where, as in this case, the jury believed the defendant did something for which he should be punished, without a third choice between conviction on the greater offense and acquittal, there is the substantial risk of an unwarranted conviction which "diminishes the reliability of both the factfinding and the sentencing determination." (*People* v. *Geiger, supra,* at p. 519, citing *Beck* v. *Alabama* (1980) 447 U.S. 625, 638, 643 [65 L.Ed.2d 392, 403, 406, 100 S.Ct. 2382].) As pointed out in *Geiger,* requiring related offense instructions allows "every material issue presented by the evidence" to be determined. (*Id.,* at p. 526.) "Instructions on lesser offenses are required because a procedure which affords the trier of fact no option other than conviction or acquittal when the evidence shows that the defendant is guilty of some crime but not necessarily the one charged, increases the risk that the defendant may be convicted notwithstanding the

obligation to acquit if guilt is not proven beyond a reasonable doubt. The pressures which create that risk thus affect the reliability of the fact finding process and thereby undermine the reasonable doubt standard." (*Id.*, at p. 520.)

It is, of course, true that the "third choice" in this case is an offense that is lesser than the charged offense only in the sense that it involves a lesser penalty; that is, however, the only sense that matters.

For the foregoing reasons, I would reverse the conviction.