Filed 5/30/14  P. v. McDonald CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DAVID MCDONALD,<br><br>        Defendant and Appellant. | A136903<br><br>(Marin County<br>Super. Ct. No. SC174897A) |

David McDonald (appellant) appeals from a judgment entered after the trial court found he was guilty of selling a substance in lieu of a controlled substance (Health & Saf. Code,[1] § 11382) and placed him on three years of probation.  He contends there was no substantial evidence to support the conviction.  We reject the contention and affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

A felony information was filed July 18, 2011, charging appellant with: (1) possession of a precursor chemical, phenylpropanolamine, for sale to persons intending to manufacture methamphetamine, on or about March 7, 2011 (§ 11383.7, subd. (f), count 1); (2) offering to sell a substance in lieu of a controlled substance on or about March 23, 2011 (§ 11382, count 2); and (3) possession of a precursor chemical, phenylpropanolamine, for sale to persons intending to manufacture methamphetamine on

---

[1]All further statutory references are to the Health and Safety Code unless otherwise stated.

1

or about March 23, 2011 (§ 11383.7, subd. (f), count 3). Appellant waived his right to a jury trial, and a bench trial was held.

In February 2011, an anonymous informant reported to police that a 70-year-old man, later determined to be appellant, was selling large quantities of ephedrine from a "head shop" named Pleasure Principle in Mill Valley. Based on that information, Scot Barr, a police officer assigned to the Western Contra Costa Narcotics Enforcement Team (WestNET), launched an investigation.

On February 28, 2011, the informant took Anthony Souza, an undercover WestNET agent, to the Pleasure Principle. The informant introduced Souza to appellant, stating Souza was an old friend. Souza told appellant he wanted to buy "two," signifying two ounces of ephedrine. Appellant retrieved a scale and a large paper bag containing a white powdery substance from behind the sales counter. He measured quantities of the substance into two Ziploc bags, advised Souza that the price was $150 per ounce, and sold him two ounces for $300. Barr later performed a Narcotic Identification Kit test on the substance, and the result was consistent with ephedrine.

On March 7, 2011, Souza returned to the Pleasure Principle and asked appellant if he could buy "a whole one," meaning one pound of ephedrine. Appellant indicated the price was $1,350. He retrieved a clear bag containing a white brick-like substance from behind the counter and placed it into a brown paper bag. Souza paid appellant $1,360 in cash and did not receive change or a receipt. The substance was later determined to be phenylpropanolamine.

Appellant then retrieved another brown bag from behind the counter and withdrew a gallon-sized Ziploc bag containing a fine white powder. Souza asked appellant "if it was the other stuff," meaning methamphetamine, and appellant replied, "yes." Souza requested a sample, and appellant took a pinch of the powder, transferred it to a small Ziploc bag, placed the small Ziploc inside the first brown bag, and handed it to Souza. The sample of "the other stuff" weighed 2.8 grams with packaging and was later determined to contain no common controlled substances.

On the evening of March 21, 2011, Souza, wearing a body wire, visited appellant at the Pleasure Principle to arrange another purchase. On an audio recording of the ensuing conversation, Souza told appellant that he and his friends had "played with" the white powdery sample and had "like[d] it." Appellant replied, "That one's limited." Souza nevertheless asked to buy "a whole one," by which he meant one pound of methamphetamine. Appellant told Souza that he had obtained the substance in question 20 or 25 years ago. He added that it was "a stray" that he had obtained from another man, in contrast to other bags he showed to Souza and claimed to have had "a hand in developing."

Souza also asked to buy "12 whole ones of the other," by which he meant 12 pounds of what he believed to be ephedrine. After available quantity and price was discussed, Souza developed an understanding that appellant had eight pounds of ephedrine for sale at $1,500 per pound, and one pound of methamphetamine for sale for $16,000. The anticipated transaction would involve a total payment of $28,000.

On March 22, 2011, Souza telephoned appellant and arranged to complete the transaction the following day. WestNET officers obtained a warrant authorizing the search of appellant, his vehicle, his workplace, and his apartment.

On March 23, 2011, Souza, again wearing a wire, arrived at the Pleasure Principle at 3:00 p.m. There was a power outage but there was ambient lighting from the windows. Appellant pulled out a couple of the bags of what Souza presumed was ephedrine, and placed them on the counter. There was also a bag on the counter, the contents of which had a different consistency than the contents of the other bags offered to Souza—"more of a powder" and a "slightly different color." Souza asked if that was "the big one," meaning the one pound of methamphetamine, and appellant replied, "Yeah, yeah." Souza asked if appellant had any more of "that sample," but appellant responded that he was providing "all there was."

Souza told appellant that he had the money in the car, but said he wanted to see the entirety of the purchase before retrieving the cash. In response, appellant stepped back and motioned to a cardboard box on the floor. Appellant opened one of the box flaps,

revealing "a bunch of Ziploc bags with white brick-like substance inside of it." In addition, appellant retrieved "a large bag full of white, off-white powdery substance" from behind the sales counter. Souza asked him if that was "the crank," or "the special one." Appellant replied, "That's logical," and he held the bag up to display it for Souza. While Souza was counting to make sure he had all the goods, appellant brought out various bags, put them on the counter, then took them off the counter. Appellant confirmed there were eight pounds of ephedrine, and Souza said, "we're lookin' for the special one." Appellant said that he saw product that was "tinted yellowish," and Souza said that the product looked like it was in "the same bag that the last one was in." Appellant replied, "Oh yeah, yeah, yeah." Souza cautioned to be careful because there was a hole in the bag, and said they should double bag it. Due to the poor lighting conditions, it was difficult to differentiate between the ephedrine and the purported methamphetamine. Ultimately, Souza said, "Alright. No I'm cool. I'm, I'm happy. Let me, uh, let me go get your money. Give me, uh, give me a little bit a time to go grab it."

Souza testified that he left the shop without either himself or appellant being sure that the "special one" was actually there. Souza made a "best-guess conclusion" as to which bags contained methamphetamine "based on how it was different in texture, appearance than the other examples of ephedrine that were hard and brick-like or chunk-like. This bag had more powder in it than it did large chunks." When Souza left the store, he told appellant that he would return in 20 minutes with payment. Upon exiting the store, Souza got into his vehicle and left the scene. Souza told Barr that "everything was in there."

Within ten minutes of Souza's exit, appellant stepped out of his store and was arrested by Mill Valley police officers. WestNET agents then entered the store to execute the search warrant. They found what they believed to be the bag of methamphetamine behind the sales counter—a Ziploc bag containing white powdery substance that was "inserted sideways and sealed into another Ziploc bag," i.e., double-bagged. Barr, who had heard Souza and appellant's conversation about how the bag was leaking and needed to be double-bagged, deduced that the substance that was double-

4

bagged was the purported methamphetamine. Souza, who later returned to the store while the search was underway, conferred with Barr regarding which of the bags contained the purported methamphetamine. Souza surmised that the substance offered as methamphetamine was an "off-white powder" that had a different appearance and texture from the "other brick-like powdered substances," and whose consistency matched the 2.8 gram sample he had previously received. The police also found additional substances in various locations in the store, and transported all of the evidence to the crime lab.[2]

Five bags of white powder that were tested by the Department of Justice laboratory were determined to contain phenylpropanolamine and lidocaine and/or tetracaine. Another item, which was the double-bagged substance, had an approximate gross weight of 489 grams and was determined to contain no controlled substances.

Appellant's brother, Angus McDonald (Angus), testified that appellant had operated the Pleasure Principle for 40 years or longer. During the 1960s, the store evolved into a retail establishment for the sale of drug paraphernalia. According to another witness, Alan Chu, the store sold "an eclectic collection of merchandise" including jewelry, adult videos, novelty items, pipes, rolling papers, food additive powders, and filler for diluting cocaine. Angus testified that over the course of his four decades in business, appellant sold whatever seemed to be marketable. In recent years, appellant had confided to Angus that his business was operating at a loss, and that he was worried about it. Angus sent his brother money from time to time. According to Angus, who is a forensic psychiatrist , there was "a disorganization element" and "a paranoid element" to appellant's thinking, and appellant was a "a major hoarder" of objects.

---

[2]Barr, who oversaw the execution of the search warrant, described the Pleasure Principle as "probably the most disarrayed place of business I have ever been in." Agents found bags of white powder stashed in six distinct areas of the store. A total of $28,590 was recovered in scattered piles of cash. Officers searched only about half of the store, at which point Barr called off the search out of fear that rats and animal feces found in the store presented a health hazard to his officers. At the end of the search, Barr was not satisfied that his team had recovered all of the contraband in the store.

Edwin Smith, an expert in the fields of chemistry, clandestine drug manufacture, and toxicology, testified about the methamphetamine manufacturing process and the role of various precursor chemicals. He testified that phenylpropanolamine is a precursor to amphetamine, but it is not an immediate precursor to methamphetamine, and that ephedrine and pseudoephedrine are immediate precursors to methamphetamine. Although a skilled chemist equipped with the proper chemicals can turn amphetamine into methamphetamine, the transformation is not commonly attempted by illicit drug manufacturers.

On July 31, 2012, the trial court found appellant guilty of count 2, selling a substance in lieu of a controlled substance. The court acquitted appellant of counts 1 and 3 for possession of a precursor chemical, phenylpropanolamine, for sale to persons intending to manufacture methamphetamine. The court suspended imposition of sentence and ordered three years of supervised probation, with credit for time served of 269 days in jail.

## DISCUSSION

Appellant contends there was no substantial evidence to support the finding that he sold a substance in lieu of methamphetamine. We disagree.

In assessing a claim of insufficiency of evidence, an appellate court must "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

Section 11382 provides: "Every person who agrees, consents, or in any manner offers to unlawfully sell, furnish, transport, administer, or give any controlled substance which is . . . specified in . . . subdivision (d) . . . of Section 11055, to any person . . . and then sells, delivers, furnishes, transports, administers, or gives, or offers, or arranges, or negotiates to have sold, delivered, transported, furnished, administered, or given to any person any other liquid, substance, or material in lieu of that controlled substance shall be punished by imprisonment in the county jail for not more than one year, or pursuant to

subdivision (h) of Section 1170 of the Penal Code."  Under section 11055, subdivision (d)(2), "[m]ethamphetamine, its salts, isomers, and salts of its isomers" are controlled substances.

Section 11382 was enacted to "discourage 'anyone from engaging or appearing to engage in the narcotics traffic' [citation] rather than to define the contractual rights of the pusher and his victim."  (*People v. Ernst* (1975) 48 Cal.App.3d 785, 791–792 [analyzing parallel statute, section 11355].)  As such, the offense is a general intent crime, and violation of that section "does not require a specific intent to substitute a substance in place of a restricted dangerous drug."  (*People v. Haines* (1975) 53 Cal.App.3d 496, 498.)  Thus, it is immaterial whether appellant, "either before or at the time of the delivery of the nonnarcotic substance, intends to deliver a narcotic or some innocuous material."  (*People v. Northern* (1967) 256 Cal.App.2d 28, 35.)  "The section is violated if there is an offer of a narcotic and a subsequent delivery of a nonnarcotic substance."  (*Ibid.*; see also *People v. Medina* (1972) 27 Cal.App.3d 473, 478 [the "intent of the individual delivering the non-narcotic substance is irrelevant" and the "offense is complete at the time of delivery"].)  Delivery of an item can occur without a transfer of possession.  (See *People v. Ernst*, *supra*, 48 Cal.App.3d at pp. 788–792 [court found there was a tender of delivery where the parties negotiated the sale, agreed on the price, and the undercover officer accepted an invitation to sample the substance]; cf. *People v. McDaniel* (1979) 24 Cal.3d 661, 664–665 [there was no "delivery" where the defendant and undercover agent discussed the price of a "hit" but never reached an agreement for the sale of the substance].)

Here, there was substantial evidence that appellant and Souza agreed to a sale, i.e., that appellant would sell Souza eight pounds of ephedrine at $1,500 per pound and one pound of methamphetamine for $16,000, for a total payment of $28,000 for the transaction.  They confirmed that Souza would return to the store with the money to make the purchase on a specified date, and Souza did in fact return to the store on that date to complete the transaction.  After a discussion regarding which bag contained the methamphetamine, Souza, although uncertain that the "special one," i.e., the purported

7

methamphetamine, was actually there, was satisfied—based on his "best-guess conclusion"—that it was. Moreover, there was evidence that appellant made a representation to Souza that one of the bags contained methamphetamine by, among other things, responding, "Oh, yeah, yeah, yeah," when Souza said, "It looks like the same bag that the last one was in that I got."[3] At the end of the conversation, Souza said, "Alright. No I'm cool. I'm, I'm happy. Let me, uh, let me go get your money. Give me, uh, give me a little bit a time to go grab it." Appellant responded, "Oh absolutely." Souza asked, "Are we good?", appellant responded, "Okay," and Souza said, "Cool."

There was also substantial evidence that the double-bagged Ziploc bag was the one that appellant had represented to Souza as containing methamphetamine. Souza was able to identify the bag based on the fact that it contained an "off-white powder" that had a different appearance and texture from the "other brick-like powdered substances," and whose consistency matched the 2.8 gram sample appellant had previously provided to him. Barr determined it was the bag that contained the purported methamphetamine because he knew, based on the conversation he had heard take place between appellant and Souza, that Souza had placed the "special" bag inside another bag to prevent it from leaking. The bag was tested and was found to contain no controlled substances, i.e., it was not methamphetamine. Substantial evidence supports the trial court's determination that appellant violated section 11382 by offering methamphetamine to Souza, then subsequently delivering a nonnarcotic substance. (See *People v. Northern*, *supra*, 256 Cal.App.2d at p. 35 [elements of the offense].)

---

[3]After appellant said, "Oh yeah, yeah, yeah," Souza said, "Wow, wow, wow, wow careful. Oh. Got a hole in your bag. Right there. Oh yeah. There we go. Yeah, let's put that back in there." Appellant then said, "It isn't." Appellant suggests that when he said, "It isn't," he meant that the bag was not the one containing methamphetamine. It is, however, unclear from the record whether that was what appellant was saying. He could, for example, have been disagreeing about whether there was a hole in the bag, or could have been indicating that another item was not methamphetamine. In reviewing the trial court's findings, we are to draw all inferences in support of the judgment rather than in support of equally plausible inferences that do not support the judgment. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11–12.) We therefore decline to interpret the words "It isn't" in the way appellant suggests that we do.

**DISPOSITION**

The judgment is affirmed.

 

                                        _____

                                        McGuiness, P.J.

We concur:

_____

Siggins, J.

_____

Jenkins, J.