Filed 9/8/22  P. v. Brown CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C092921 |
| Plaintiff and Respondent, | (Super. Ct. Nos. 19FE021164, 20FE002988) |
| v. | |
| ISAAC FOSTER BROWN, | |
| Defendant and Appellant. | |

After a jury trial in each of two cases, defendant Isaac Foster Brown was convicted of firearm-related offenses, including assault with a firearm.  The trial court sentenced defendant to an aggregate term of 18 years in state prison, which included two upper term sentences.  On appeal, defendant challenges various aspects of his convictions:  (1) the use of a preliminary hearing transcript at his first trial, (2) the trial court's refusal to accept a negotiated disposition, (3) the propriety of instructing the jury that the prosecution need not prove the date of defendant's possession of a firearm, and

1

(4) his sentences.[1]  We affirm the convictions but, in light of recent legislation,  we remand the cause for a new sentencing hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

In Sacramento County Superior Court case No. 19FE021164, defendant was convicted of shooting Ronald Fields in the parking lot of a convenience store, during a child custody exchange between Fields' girlfriend Leandra Carter (mother), and defendant (father).  Surveillance video recorded the incident and there were additional witnesses to various parts of the event.

In Sacramento County Superior Court case No. 20FE002988, defendant was convicted of two counts of being a felon in possession of a firearm.  Given the nature of the instant appeal, we briefly summarize  the procedural background regarding defendant's convictions in the two cases, expanding upon facts necessary for the resolution of each issue as we address them.

In case No. 19FE021164, defendant was charged with assault with a firearm (Pen. Code, § 245, subd. (a)(2))[2] (count one) and with being a felon in possession of a firearm (§ 29800, subd. (a)(1)) (count two).  In connection with count one, the information alleged that defendant had personally  used a firearm (§§ 12022.5, subds. (a) & (d), 1192.7, subd. (c)(8)) and personally  inflicted great bodily injury (§§ 12022.7, subd. (a),

---

[1]  Defendant's notice of appeal was filed on October 5, 2020.  Subsequently both parties requested and received multiple extensions of time to file their briefs.  Appellant's reply brief was filed on April 14, 2022.  While this appeal was pending, Assembly Bill No. 1869 (2019-2020 Reg. Sess.; effective July 1, 2021) and Senate Bill No. 567 (2021-2022 Reg. Sess.; effective Jan. 1, 2022) were enacted.  On April 20, 2022, defendant's request to file a supplemental brief addressing these two new statutes was granted.  Thereafter, on May 31, 2022, the case was fully briefed and assigned to this panel.

[2]  Undesignated statutory references are to the Penal Code.

2

1192.7, subd. (c)(8)) on the victim, Fields. Defendant posted bail while awaiting trial on this case.

Defendant was subsequently arrested and charged, in case No. 20FE002988, with two counts of being a felon in possession of a firearm; a .40-caliber handgun (§ 29800, subd. (a)(1)) (count one), and a nine-millimeter handgun (count two). In association with both counts, the information alleged that defendant committed the offenses while released from custody on bail (§ 12022.1) on three different cases, including case No. 19FE021164.

The two cases were not consolidated but were each tried in front of a separate jury within days of one another. The first jury found defendant guilty of all charges in case No. 19FE021164, and found true the allegation that he personally used a firearm. The jury found not true the allegation that defendant personally inflicted great bodily injury on the victim. Three days later, in case No. 20FE002988, a jury found defendant guilty of all charges. In a bifurcated proceeding, the trial court found true that defendant committed the current offenses while released from custody on bail in case No. 19FE021164. During each trial, defendant stipulated that he had a prior felony conviction from the State of Nevada.

The trial court sentenced defendant to 14 years eight months in case No. 19FE021164, which consisted of two upper term sentences and, in case No. 20FE002988, to a consecutive, aggregate term of three years four months.

Defendant filed timely notices of appeal.

## DISCUSSION

### I

### *Use of Prior Testimony Pursuant to Evidence Code Section 1291*

Defendant contends the trial court deprived him of his constitutional right to confront witnesses when it admitted the named victim's preliminary hearing testimony at his jury trial, without first requiring the prosecution to exercise due diligence to procure

the victim's presence. We agree with the People in concluding that the prosecutor's efforts to secure Fields' presence were reasonable under the circumstances and that the trial court did not err in admitting his testimony.

*A. Additional Background*

Fields testified at the preliminary hearing in case no. 19FE021164. Defendant's counsel cross-examined him. Subsequently, on July 30, 2020, prosecution investigator Guy Uyeda served a subpoena on Fields to appear in court either via Zoom or in person on August 13, 2020. Uyeda recalled that Fields was upset with him when he served the subpoena and told Uyeda that he was not going to show up. On August 13, 2020, Fields appeared as directed in the subpoena, via Zoom for a witness recognition hearing and the trial court ordered him to appear in person at 8:20 a.m. on August 20, 2020; the time and date Fields was scheduled to testify. Fields' attorney was also present for this hearing.

Trial subsequently progressed at a faster rate than anticipated and the parties discussed whether it would be possible to expedite Fields' scheduled testimony. On August 18th, the prosecutor told the trial court that she had reached out to Fields' attorney and Fields' attorney indicated she attempted to contact Fields via text, to inform him that the trial court requested he appear earlier than August 20th as he had been previously ordered. Fields did not respond to her text message. The prosecutor stated, "so I'm going to assume he will be here Thursday." The trial court then asked the prosecutor to contact Fields' attorney again because it was concerned Fields would not show up on Thursday. The prosecutor stated, "I have that concern, too."

When Fields failed to appear on August 20th, the trial court immediately granted the prosecutor's request to issue a warrant for his arrest. Fields' attorney, who appeared in court later that morning, stated that her last communication from Fields was on Thursday, August 13th. She stated she sent a text message to him asking if he could come to court on Tuesday, August 18th, but she never heard back from him and it was her understanding that he was ordered to appear that morning, Thursday the 20th. She

4

assured the trial court that she would inform Fields about the warrant and that the trial court had ordered him to appear.

Before the lunch break, the prosecutor stated that she "had a good gut feeling Mr. Fields wasn't going to show up today, and [her] plan was to issue a warrant today." She requested "to have the rest of the day to give [her] investigators the chance to find Mr. Fields." The court said it would address that request in the afternoon session.

That afternoon, the prosecutor represented to the trial court that investigators were looking for Fields, and requested additional time to search for him. The prosecutor stated that the investigators went to Fields' mother's house, which was Fields' address of record. His mother told the investigators that Fields was out of town. The prosecutor suspected Fields' mother was helping him hide. The prosecutor also stated that she provided investigators with new information regarding Fields' former paramours who were involved in the case.

The trial court allowed the prosecution until the next morning to find Fields and stated that if Fields did not appear, the trial would continue without him. The prosecutor responded that if Fields did not appear the next day, she would ask the trial court to declare him "unavailable" pursuant to Evidence Code section 240 and ask to be allowed to read the transcript of his preliminary hearing testimony into the trial record. Defense counsel expressed no opinion on the issue, other than to remind the trial court that "time is wasting." The trial court indicated that if Fields did not show up the next day, it was prepared to find Fields unavailable based on the fact that he was served, subsequently recognized by the court, then failed to appear.

Fields did not appear in court the following morning, and the prosecutor gave the trial court an update on her efforts to locate him, including the fact that investigators went to Fields' father's house and spoke with him and Fields' son. Fields' father apparently told the investigators that Fields was out of town, and then became confrontational, prompting the investigators to leave.

5

At the trial court's request, the prosecution briefly summarized for the record its attempts to procure Fields, as recounted above. The trial court acknowledged that defendant filed an opposition to the prosecutor's request to admit Fields' preliminary hearing testimony, and divided the discussion into two parts: (1) the witness's unavailability, and (2) the admissibility of testimony from the preliminary hearing. As to unavailability, defendant argued that the prosecution knew Fields presented a substantial flight risk before he actually failed to appear but made no effort to ensure his presence at trial. In response, the prosecutor noted that, while Fields expressed reluctance to appear when he received the subpoena, he did appear as subpoenaed with his attorney on August 13th. The prosecutor also stated that she had to wait for the warrant to issue; she could not arrest Fields without cause. In response to both arguments, the trial court noted that there is a statutory provision that would have allowed the prosecution, upon a showing of need, to get the court to issue an arrest warrant for the witness. The other option was to "simply be on the guy, and as soon as he didn't show up at the time he was directed, then to pick him up on a warrant that the Court would issue instantly."

The parties discussed the scope of the evidence to be admitted, should the trial court find Fields unavailable. Defendant ultimately agreed that Fields' testimony was innocuous or insignificant. With that, the trial court found Fields unavailable and allowed the prosecution to have a witness read much of his preliminary hearing testimony to the jury.

During his testimony at the preliminary hearing, Fields admitted he was shot in 2019, but denied he was the person who was shot at the convenience store. He refused to answer numerous questions about the incident, even after the court ordered him to do so. When he did answer, he either denied knowledge of the event or was equivocal, stating that he could not tell if he was the person who was in the surveillance video and that he did not know if it could be him. Fields also denied knowing or ever seeing defendant before his testimony.

6

Leandra Carter, Fields' girlfriend at the time of the shooting, testified at trial in a manner similar to that of Fields' preliminary hearing testimony. She testified she did not recall if she was with Fields at the convenience store, she did not recall a shooting that day or seeing defendant fight with Fields. Thereafter, she was impeached with prior inconsistent statements in which she stated that defendant shot Fields in the leg during a fight at the convenience store.

### B. Analysis

"A criminal defendant has the right, guaranteed by the confrontation clauses of both the federal and state Constitutions, to confront the prosecution's witnesses." (*People v. Herrera* (2010) 49 Cal.4th 613, 620.) Even a right as sacred as the right to confront and cross-examine is not absolute. (*Chambers v. Mississippi* (1973) 410 U.S. 284, 295.) Testimonial statements may be admissible if the declarant is unavailable and the defendant has had a prior opportunity to cross-examine. (*Crawford v. Washington* (2004) 541 U.S. 36, 59.) "Evidence Code section 1291 codifies this traditional exception. [Citation.] When the requirements of Evidence Code section 1291 are met, 'admitting former testimony in evidence does not violate a defendant's right of confrontation under the federal Constitution. [Citations.]' " (*People v. Wilson* (2005) 36 Cal.4th 309, 340 (*Wilson*).)

"Evidence Code section 1291, subdivision (a)(2), provides that former testimony is not rendered inadmissible as hearsay if the declarant is 'unavailable as a witness,' and '[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing.' In turn, Evidence Code section 240, subdivision (a)(5), states a declarant is 'unavailable as a witness' if the declarant is '[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process.' " (*Wilson, supra*, 36 Cal.4th at p. 341.)

7

"[T]he prosecution bears the burden of showing that the witness is unavailable and, additionally, that it made a 'good-faith effort' (*Barber v. Page* (1968) 390 U.S. 719, 725) or, equivalently, exercised reasonable or due diligence to obtain the witness's presence at trial. (*People v. Cromer* (2001) 24 Cal.4th 889, 892 (*Cromer*); see *People v. Valencia* (2008) 43 Cal.4th 268, 291-292 ['California law and federal constitutional requirements are the same in this regard.'].)" (*People v. Sanchez* (2016) 63 Cal.4th 411, 440 (*Sanchez*).) The courts have not divined a mechanical definition for reasonable or due diligence. It " 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.' " (*Cromer*, at p. 904.)

Generally, the prosecution is not required "to keep 'periodic tabs' on every material witness in a criminal case . . . ." (*People v. Hovey* (1988) 44 Cal.3d 543, 564.) However, when the prosecution has knowledge of a " 'substantial risk that this important witness would flee,' " it has the burden to " 'take adequate preventative measures' " to stop the witness from disappearing. (*Wilson, supra*, 36 Cal.4th at p. 342; see also *People v. Friend* (2009) 47 Cal.4th 1, 68.) This additional burden is triggered when the witness's testimony is deemed "critical" or "vital" to the prosecutor's case. (*People v. Louis* (1986) 42 Cal.3d 969, 989-991; *Hovey*, at p. 564.) When an important witness is at risk of becoming unavailable prior to trial, the prosecution's failure to seek his or her detention as a "material witness" under section 1332[3] is germane to the question of whether it exercised due diligence in attempting to secure the witness's attendance at trial.[4] (*Louis*, at p. 993; *Hovey*, at p. 564.)

---

[3] Section 1332 empowers the court to have a material witness post security if there is good cause to believe he or she will not appear to testify. If the witness fails to do so, the court may order his or her detention subject to certain review procedures.

[4] Defendant does not argue that due diligence required the prosecution to seek Fields' sequestration under that statute.

The totality of efforts of the proponent, in this case the prosecution, to achieve the presence of the witness must be considered by the court. "Prior decisions have taken into consideration not only the character of the proponent's affirmative efforts but such matters as whether he reasonably believed prior to trial that the witness would appear willingly and therefore did not subpoena him when he was available (*People v. Banks* (1966) 242 Cal.App.2d 373, 377), whether the search was timely begun, and whether the witness would have been produced if reasonable diligence had been exercised [citation]." (*People v. Linder* (1971) 5 Cal.3d 342, 347) Other relevant considerations include " 'the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.' " (*People v. Herrera, supra*, 49 Cal.4th at p. 622.)

In reviewing this issue, we defer to the trial court's determination of the historical facts if supported by substantial evidence, but review the trial court's ultimate finding of due diligence independently. (*Sanchez, supra*, 63 Cal.4th at p. 440.)

Defendant argues that the prosecution failed to exercise due diligence when, prior to trial, it did not take reasonable precautions to ensure Fields' presence at trial. Defendant claims the prosecution knew as early as July 30th, the date the investigator served Fields his subpoena, that Fields had no intention of appearing in court to testify, yet took no steps to ensure he would appear and did not attempt to locate Fields until he actually failed to appear on the date he was scheduled to testify. Defendant asserts this lack of action prior to trial was unreasonable under the circumstances. We disagree.

Although Fields told the investigator who served the subpoena that he was not going to show up, we are not convinced that this comment reflected a substantial risk that Fields would not appear. Indeed, he did appear on Zoom with his counsel on August 13th, the date on which he was subpoenaed to appear. Not only did Fields appear as ordered, but he also gave no indication that he would disobey the trial court's order to appear in person on August 20th. Given these actions by Fields, it would have been reasonable for the prosecution to assume that there would be no difficulty in securing

9

Fields' attendance, seven days later. "Prior cooperation of the witness with the prosecuting officials would tend to convince the court that the district attorney originally assumed with propriety that [the witness] would be readily available." (*People v. Horn* (1964) 225 Cal.App.2d 1, 8.)

Nor are we convinced that the search for Fields should have begun or that the prosecution should have taken preventative measures on August 18th when the prosecutor first became aware that Fields did not respond to his attorney's text message. Defendant argues that this should have prompted action from the prosecution. We do not view a failure to respond to an informal request to appear earlier than ordered, as an indication that Fields' intended to disobey the court's order to appear in person two days later such that the prosecution should have increased efforts to ensure his presence at trial. " 'The law requires only reasonable efforts, not prescient perfection.' [Citation]" (*People v. Diaz* (2002) 95 Cal.App.4th 695, 706.) This is especially true as Fields' testimony was not "critical" or "vital" to either party's case. The lack of "critical" testimony, coupled with a continued reasonable belief that Fields would appear as ordered leads us to conclude that there was no additional burden on the prosecution to take preventative measures, such as those outlined in section 1332, to prevent Fields from disappearing. (See *People v. Hovey, supra*, 44 Cal.3d at p. 564 [where the witness's testimony was largely cumulative and not vital to the prosecution's case, the prosecution was not required to take adequate preventative measures as part of its due diligence].)

When Fields did not appear at trial on August 20th, the prosecutor acted swiftly. At her request, the trial court issued an arrest warrant and allowed the prosecutor the remainder of the day to search for Fields. Immediately thereafter, the prosecutor had two investigators looking for Fields. There is no indication that any leads as to Fields' location were left unexplored.

Additionally, Fields' testimony was not particularly important. (See *Sanchez, supra*, 63 Cal.4th at p. 442 [citing importance of testimony as a factor in the due

diligence analysis]; *People v. Cromer, supra*, 24 Cal.4th at p. 904 [same].) As we mentioned above, Fields preliminary hearing testimony consisted of denials, refusals to answer, or equivocal statements. Defendant acknowledges this point but argues that Fields' testimony still served to bolster the prosecution's case because it supported the prosecutor's theory that Fields and Carter were lying about the shooting. Consistency with a prosecution theory does not necessarily render the testimony important. Although Fields was the named victim, given the nature of his preliminary hearing testimony, his trial testimony was not necessarily critical to either the prosecution or the defense. In a case like this, with other evidence of guilt, "there is a limit to what one can expect the prosecution to do to procure the attendance of a noncritical witness." (*Sanchez*, at p. 442.)

Considering the totality of the circumstances, it was reasonable to believe that Fields would appear to testify at trial as ordered. The prosecutor's actions upon Fields' failure to appear demonstrate that the prosecutor made reasonable efforts to locate Fields, notwithstanding that such diligence was ultimately unrewarded. (Cf. *People v. Diaz, supra*, 95 Cal.App.4th at pp. 706-707 [due diligence in numerous attempts to find a witness once trial started, despite being defeated by witness's determined effort to avoid testifying]; cf. *People v. Cromer, supra*, 24 Cal.4th at pp. 904-905 [no due diligence where the prosecutor knew the witness disappeared two weeks after the preliminary hearing but waited six months to search for witness, then failed to follow upon the witness's possible location in a timely manner].)

We conclude the trial court correctly found the prosecution exercised due diligence to attempt to ensure Fields' presence at trial and properly admitted his preliminary hearing testimony. In light of this conclusion, we need not address defendant's harmless error analysis.

## II

### *Plea Negotiations*

After the jury found defendant guilty in the first case, the parties prepared for trial on case No. 20FE002988. The day before that trial, the parties negotiated a resolution of the case through a plea agreement. The day of trial, after the jurors arrived for voir dire, defense counsel informed the court of the proposed resolution. The trial court refused to ratify the agreement. Defendant argues that the trial court erred in refusing to consider or in rejecting the negotiated plea. The People argue that the trial court considered the plea, but properly exercised its discretion in rejecting it. We agree with the People.

*A. Background*

Prior to the first trial, the trial court encouraged the parties to reach a settlement agreement regarding the cases pending against defendant. The prosecutor represented that defendant was facing charges in five cases, including "carjacking," and she would expect any agreement to include "a fair amount of time in prison." Defense counsel stated he was willing to discuss any offers from the prosecution with his client. Both parties believed that a global resolution was unlikely because defendant had expressed his unwillingness to accept a plea bargain.

After jury selection in the second trial began, defense counsel informed the trial court that he and defendant recently discussed a resolution, and that defendant was disappointed that the trial was apparently going forward despite the resolution. When the trial court requested clarification, defense counsel stated the following. "At the last jail visit that I had with him, which was yesterday early afternoon, I indicated to him that there were offers going back and forth, and I indicated to him that I would be able to resolve. I knew that -- at that point what the District Attorney wanted in terms of a plea deal, and Mr. Brown indicated his acceptance of that. So I indicated to him that the case would be resolving."

12

Defendant told the trial court he did not want to be in court that day and asked if they could postpone the trial. Speaking to defendant, the trial court responded that, two days prior, it suggested that defendant enter a time waiver so that he would have an opportunity to work with the attorneys for a global resolution of defendant's pending cases, but defendant refused to do that and instead stated that he wanted to go to trial. The court nevertheless granted defense counsel's request for a two-day continuance but now that those two days had passed, "you come in and say, *Oh, I don't want to go to trial. That isn't how it works. [¶] We brought 55 jurors in the middle of a COVID pandemic in because of the trial that you are entitled to and that you requested to not have delayed. We are going to have that trial."

The trial court asked the prosecutor to put on the record the discussion regarding the plea resolution. The prosecutor stated that her understanding was that defendant agreed to plead to both counts one and two for a total of 16 months; eight months consecutive on each count, and consecutive to the prior case. In exchange, the prosecution would agree to strike the allegation with respect to the out-on-bail enhancement. Defense counsel explained they resolved the case the prior afternoon but he mistakenly sent notice of the resolution to the general court department e-mail address.

The trial court stated its reasons for rejecting the plea agreement: "[T]his case involves, in addition to the convicted felon in possession of a gun, the 29800, two counts, two weapons, the additional allegations that he was out on bail or out free pending disposition of other matters that he had and that crime that is charged here was committed while he was out on bail, for reasons that I think are of significant importance, when defendants commit new crimes while they are out on bail --." The trial court continued, "Mr. Brown was released from custody pending adjudication of . . . two previous cases for which he was out on bail. It is frequently the custom and case resolution for the District Attorney and the Defendant to resolve by dumping the out-on-bail or out-of-custody enhancement, and I think that that is unfortunate because I think it's critically

13

important that there be, as a matter of policy, an understanding by defendants who are out on bail, or prospectively and hopefully out because of other alternatives to bail, to which both the legislature and the courts are giving focus right now, that if those are to work, if people are to have alternatives to bail, if people are to successfully be out on bail, they must understand that indeed there are consequences when they commit new crimes while they are out on bail. [¶] And in this case this Defendant has committed a substantial number of crimes, one after another, after another, and at least some of those were when he was out on bail. So I find that significant, and to give him the benefit of just knocking that out, just setting that aside by virtue of the plea negotiation I reject. [¶] The second thing is -- and I think this is also a factor, but it's not dispositive factor -- is that we got 55 jurors in the middle of a COVID pandemic to come down to try his case, and it's not acceptable to the Court to have done that and then let the case resolve, other than pleading to the sheet, on the day that they come in. [¶] I do appreciate and understand, [defense counsel], that you sent an e-mail yesterday afternoon -- by the way the jurors had already been ordered in -- letting the Court know that there was a proposed resolution, as you noted, and we have had a conference in chambers with both counsel, the Court was totally unaware of that and the clerk was unaware of that, although I appreciate that it was sent to the Court, it was sent to our generic Department 4 e-mail and would have been checked, but those are not checked on a regular basis. Those don't come to the clerk or the judge. [¶] So the point is that we are going to proceed on this case. The Defendant is entitled to a trial, and we'll provide a trial for him."

### B. Analysis

Plea negotiations and agreements are an integral, essential and accepted component of our criminal justice system. (*People v. Segura* (2008) 44 Cal.4th 921, 929.) Such agreements promote speed, judicial economy and the finality of judgments. (*Ibid*.) The process involves an agreement negotiated by the People and the defendant, which requires judicial approval as an essential condition precedent to the bargain's

14

effectiveness. (*Id.* at pp. 929-930.) The parties' negotiated disposition is ineffective unless and until it is approved by the court. (See *People v. Orin* (1975) 13 Cal.3d 937, 942-943.) This principle is recognized in numerous statutes (e.g., §§ 1192.1, 1192.2, 1192.4), the most significant of which is section 1192.5. The trial court's authority to withdraw approval or otherwise reject a plea bargain under section 1192.5 is " 'near-plenary.' " (*People v. Kim* (2011) 193 Cal.App.4th 1355, 1361, quoting *People v. Stringham* (1988) 206 Cal.App.3d 184, 195.)

Generally, a trial court may exercise its discretion to reject approval of a plea bargain because: (1) the court believes the agreement is "not fair" (*People v. Loya* (2016) 1 Cal.App.5th 932, 947 (*Loya*)); (2) new facts have come to light; (3) the court has become more fully informed about the case; or (4) when, after further consideration, the court concludes that the agreement is " 'not in the best interests of society.' " (*People v. Silva* (2016) 247 Cal.App.4th 578, 588, italics omitted.) But this list is not exhaustive.

We therefore review the trial court's decision to reject a negotiated plea agreement for an abuse of discretion. (*Loya, supra*, 1 Cal.App.5th at pp. 946-947 [rejecting a plea agreement]; *People v. Smith* (1971) 22 Cal.App.3d 25, 30-31 [refusal to consider a plea agreement].)

Initially, we reject defendant's claim that the trial court refused to consider the plea agreement. At the trial court's request, the parties explained the details of the plea agreement. In rejecting the offer, the court provided a detailed statement as to its disagreement with the terms of the resolution. In particular, the court did not agree with the prosecution's willingness to dismiss the on-bail enhancement when defendant already faced serious firearm-related charges. The fact that the trial court rejected the agreement, does not reflect a refusal to hear or consider it.

We further conclude that the trial court did not abuse its discretion in rejecting the plea agreement. "In exercising their discretion to approve or reject proposed plea bargains, trial courts are charged with the protection and promotion of the public's

15

interest in vigorous prosecution of the accused, imposition of appropriate punishment, and protection of victims of crimes." (*In re Alvernaz* (1992) 2 Cal.4th 924, 941.) In this case, the trial court found that the parties' decision to dismiss the on-bail enhancements as part of the plea agreement did not protect or promote the public's interest because defendant had repeatedly violated the law, with serious allegations involving firearms, while released on bail. Nor did the resolution provide the appropriate punishment in the trial court's view. As the People argue, this reasoning also demonstrates an effort to protect the integrity of the bail system.

Defendant does not address these arguments, rather he focuses on the second, nondispositive, reason provided by the trial court: the readiness of the prospective jury to hear the trial.

Defendant argues that the readiness of the prospective jury does not provide a legitimate reason to reject a plea and that it "is evident that the parties sought to enter into the plea agreement *before* the jury panel was called."[5] Recognizing the trial court's disapproval stems, in part, from the timing of the proposed plea, defendant notes that section 1192.5 places no timeliness requirement in which a case must be settled.

We recognize that "California decisions emphasize that successful judicial administration depends upon a positive attitude toward plea bargaining." (*People v. Cobb* (1983) 139 Cal.App.3d 578, 584.) Yet a court may set a deadline in the pretrial process for the acceptance of a plea bargain to facilitate effective calendar management. (*Loya, supra*, 1 Cal.App.5th at p. 947.) In expressing its disapproval of the timing of the settlement notice, the trial court reminded defendant of several events that suggested the proposed plea was not timely. The court noted its prior encouragement for the parties to settle, the prior indications that defendant was not interested in settling and demanded

---

[5] The record demonstrates that neither party immediately mentioned the proposed plea to the court, and instead waited until jury selection began.

16

trial, and the presence of the 55 potential jurors called to the courthouse during a pandemic in order to provide defendant his right to a jury trial. Ultimately, however, the trial court did not indicate it would not accept defendant's plea as untimely, only that it would not approve the plea agreement. We find the trial court acted within its discretion in doing so. As such, we need not address defendant's harmless error analysis.

### III

### *CALCRIM No. 207*

Defendant claims that the trial court erred in deviating from the settled jury instructions to give CALCRIM No. 207 in case No. 20FE002988 (second trial). This instructed the jury that the prosecution did not need to prove that the firearm possession crimes took place on the date alleged but only "reasonably close to that day." Defendant contends that by waiting until after defense counsel gave his closing argument to grant the prosecution's request to use the instruction, the trial court abused its discretion, depriving him of a meaningful opportunity to present a defense and his right to due process.

#### A. Additional Background

The prosecution charged defendant with two counts of being a felon in possession of a firearm (§ 29800) "[o]n or about February 13, 2020." On that date, law enforcement officers searched a vehicle in which defendant was the sole backseat passenger. Officers found two firearms in a satchel under the backseat cushion. Just prior to the search, an officer saw defendant repeatedly lean over in that area. One of the firearms was subsequently determined to have defendant's palm print on it.

After the defense had rested its case but before closing arguments had begun, defense counsel reminded the court that the prosecution had requested CALCRIM No. 207 and that the defense objected to the trial court giving that instruction. The trial court acknowledged the request and objection but did not rule on the request before the parties gave their closing arguments.

17

The prosecution argued that defendant's palm print found on one of the firearms, coupled with his movements in the backseat, suggested defendant knew about the firearm and helped to conceal them under the backseat cushion. However, the prosecution emphasized, "A person doesn't actually have to hold something to possess it. He doesn't have to touch it. Okay. It's enough if that individual has control over it or the right to control it, either personally or through another person." In response, the defense argued that there was no way to determine when defendant had touched that firearm or defendant's knowledge that the firearms were under the cushion. Counsel argued that the firearm could have been touched months prior to February 13th and placed under the seat on a different day by a different person. In arguing the prosecution did not meet its burden, defense counsel stated, "There is also the charging document in this case, that says that he possessed this gun on February 13th, 2020. [¶] Now, when on that date, right -- it's limited to that date, right? And the DA may require -- may want to argue that, well, no it's not, but that's what the notice says."

Before the prosecutor began her rebuttal argument, she asked the trial court whether it planned to grant her request for CALCRIM No. 207. The court held an unreported discussion at the bench. The prosecution continued to argue that "possession" under section 29800 does not require proof that defendant actually touched the firearm on February 13, 2020.

The trial court instructed the jury with CALCRIM No. 207, which said: "It is alleged that the crimes charged occurred on or about February 13th, 2020. The People are not required to prove that a crime took place exactly on that day but only that it happened reasonably close to that day."

*B. Analysis*

To ensure that the parties have an opportunity to intelligently argue the case to the jury, the law requires "the court, on request of counsel, . . . [to] advise counsel of all instructions to be given" "[b]efore the commencement of the argument." (§ 1093.5; see

18

*People v. Kronemyer* (1987) 189 Cal.App.3d 314, 341, disapproved on another ground in *People v. Whitmer* (2014) 59 Cal.4th 733, 742.) Section 1094 expressly authorizes a trial court to modify the general order of proceedings in trial as they are described in sections 1093 and 1093.5, when necessary. This section provides: "When the state of the pleadings requires it, or in any other case, for good reasons, and in the sound discretion of the court, the order prescribed in Section 1093 may be departed from." (§ 1094; see also *People v. Hill* (1992) 6 Cal.App.4th 33, 47-48 [§ 1094 gives the court broad discretion to depart from the usual prescribed order of trial].)

To prevent unfair prejudice, if a court issues a supplemental instruction that introduces new matter for consideration by the jury, the parties should be given an opportunity to argue the theory. (*People v. Ardoin* (2011) 196 Cal.App.4th 102, 129 (*Ardoin*), disapproved on other grounds in *People v. Dalton* (2019) 7 Cal.5th 166, 214, citing *U.S. v. Fontenot* (9th Cir. 1994) 14 F.3d 1364, 1368 & *People v. Bishop* (1996) 44 Cal.App.4th 220, 231-235 (*Bishop*).) However, additional argument is not required when a supplemental instruction clarifies an existing theory. (Cf. *Fontenot*, at p. 1368; *Bishop*, at pp. 231-235.)

We review the decision to issue a supplemental instruction for abuse of discretion. (§§ 1093.5, 1094; *Ardoin, supra*, 196 Cal.App.4th at p. 127; *People v. Smith* (2008) 168 Cal.App.4th 7, 16.)

Defendant claims that by waiting until just before the prosecutor's rebuttal argument to rule on the request to instruct the jury on CALCRIM No. 207, the trial court violated section 1093.5, deprived him a meaningful opportunity to defend himself in light of the instruction, and violated due process. He also claims the trial court erred by not affording defense counsel the opportunity to present additional argument to address the late instruction. However, defense counsel did not request to do so, and we thus find that defendant forfeited any claim of error by failing to do so. (*Bishop, supra*, 44 Cal.App.4th at p. 235 ["defense counsel did not seek leave to reopen arguments to address" the

instructional change]; cf. *People v. Young* (2007) 156 Cal.App.4th 1165, 1171 [defendant's failure to object to having case reopened to present additional closing argument to jury forfeited the issue on appeal].)

Moreover, even if defendant's challenge was not forfeited, and even if we were to find error, defendant fails to show the error prejudiced his defense because the supplemental instruction only clarified the prosecutor's existing theory, and was a correct statement of the law. Where a court erroneously fails to settle instructions before argument, "[a] party suffers prejudice if it 'was unfairly prevented from arguing his or her defense to the jury or was substantially misled in formulating and presenting arguments.' " (*U.S. v. Foppe* (9th Cir. 1993) 993 F.2d 1444, 1451 [addressing violation of Fed. Rules Crim.Proc., rule 30, 28 U.S.C., which is analogous to § 1093.5]; *Ardoin, supra*, 196 Cal.App.4th at p. 134 [applying same prejudice standard to § 1093.5 violation].) Material modification and departure from agreed upon instructions may deprive a defendant of a fair trial. (*People v. Kronemyer, supra*, 189 Cal.App.3d at p. 341.)

The clarification that the possession could take place "reasonably close to that day" was a de minimis modification and was consistent with the law applicable to this case. CALCRIM No. 207 simply states the general rule that when, as here, a crime is alleged to have occurred "on or about" a certain date, it is not necessary for the prosecution to prove the offense was committed on that precise date, but only reasonably close to that date. (See § 955; *People v. Rojas* (2015) 237 Cal.App.4th 1298, 1304.) An exception to that general rule exists when the timing of the offense is material. Thus, it is improper to give CALCRIM No. 207 "when the prosecution's proof establishes the offense occurred on a particular day to the exclusion of other dates, and when the defense is alibi (or lack of opportunity)." (*People v. Jennings* (1991) 53 Cal.3d 334, 358-359; accord, *People v. Jones* (1973) 9 Cal.3d 546, 557, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069; Judicial Council of Cal., Crim. Jury Instns.

(2022) Bench Notes to CALCRIM No. 207, p. 38.) There is no dispute that this exception does not apply.

Next, we note defendant does not claim or even suggest how defense counsel would have changed his closing argument to address this supplemental instruction. (*Bishop, supra*, 44 Cal.App.4th at p. 234.) Thus, whether examined as trial error or ineffective assistance of counsel for failing to either request to reopen argument in light of CALCRIM No. 207 or anticipate the instruction in formulating his closing argument, defendant has not established that he was prejudiced from the late inclusion of the instruction.[6] Defendant argues that the damaging impact of the supplemental instruction was that it validated the prosecution's argument that whether defendant touched the firearm on February 13th was irrelevant to whether he possessed it on or about that day for purposes of the statute, and that counsel did not have an opportunity to respond. This was a correct statement of law regarding constructive possession, and defendant does not argue otherwise. Defense counsel's closing argument seemingly acknowledged this, and he argued that because there was no proof that defendant touched the firearms on February 13th or even reasonably close to that day, there was also no proof that defendant had knowledge of the firearms under the seat cushion such that he could have had constructive possession of them on that day. In light of the facts of the case, this argument was reasonable, even with the late addition of CALCRIM No. 207. As a result, defendant has not shown, and we do not perceive, that defense counsel's argument "would have appreciably differed or been any more persuasive if the case had been reopened" to allow counsel to address CALCRIM No. 207. (*Ardoin, supra*,

---

[6] Defendant notes in passing that providing supplemental jury instructions may render trial counsel ineffective. He does not argue trial counsel in this case was constitutionally ineffective for failing to adequately prepare for the uncertainty around whether CALCRIM No. 207 would be provided.

21

196 Cal.App.4th at p. 134.) We therefore conclude that defendant was not unfairly prejudiced by the supplemental instruction of CALCRIM No. 207.

## IV

### *Penal Code Section 1170*

Defendant argues we must remand the matter to permit the trial court to reconsider the upper term sentences in light of recent statutory changes that apply to him retroactively. The People agree that the recent amendments apply retroactively to defendant, but disagree that resentencing is required. The People argue that because the trial court imposed the upper term based on defendant's recidivism, any error in the trial court's reliance on unproven prior convictions was harmless beyond a reasonable doubt.

*A. Additional Background*

During the sentencing hearing the trial court addressed the "aggravating and mitigating considerations" as follows: "Mr. Brown has a significant and repeated intersection with the criminal justice system. He has two prior felony convictions, one in 2012 and another one on January 7th of 2016. The 2012 matter he received probation and 180 days in jail, and on the 2016 matter, 24 to 60 months in prison in Nevada. He also has two misdemeanor convictions. [¶] In terms of aggravating considerations, there were several. The 19FE021164 matter involved great bodily harm -- considerable threat of great bodily harm, and other acts disclosing a high degree of cruelty, viciousness or callousness. He was armed with and used a weapon at the time of the crime. He engaged in violent conduct. [¶] His prior convictions are significant. [¶] I take into account the seriousness of his conduct but do not, for purposes of the aggravation, consider any factors which are otherwise independently matters for which I'm going to sentence him today. I just want to make the point that as these crimes go, these were among the more aggravated that I have seen, and he does have the aggravated history. [¶] [Defense counsel] did a remarkable job in persuading the jury not to return a finding of true on the great bodily injury allegation. That's unusual in a case where the victim has been shot."

22

Subsequently the court stated: "Based upon the aggravating factors substantially predominating -- and indeed I can find no mitigating factors -- as to 19FE021164, I'm imposing the upper term of four years for the 245 (a)(2). [¶] I am imposing the upper term of ten years for the 12022.5, use of a firearm and shooting the victim and injuring that victim."

The trial court sentenced defendant in case No. 19FE021164 to the upper term of four years on count one (§ 245, subd. (a)(2)); the upper term of 10 years for the corresponding firearm enhancement (§ 12022.5); and one-third of the midterm of two years, for eight months on count two (§ 29800, subd. (a)(1)). In case No. 20FE002988, the trial court sentenced defendant to consecutive terms of one-third of the midterm of two years, or eight months, each on the two felon in possession counts; and two years for the on-bail enhancement (§ 12022.7, subd. (a)).

### B. Analysis

In *Cunningham v. California* (2007) 549 U.S. 270, the United States Supreme Court explained, the Sixth Amendment to the Federal Constitution "proscribes a sentencing scheme that allows a judge to impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by the defendant." (*Cunningham*, at pp. 274-275.) The court held that the middle term prescribed in California's determinate sentencing law was the statutory maximum. (*Cunningham*, at p. 288.) Subsequently, in *People v. Black* (2007) 41 Cal.4th 799, 816, the California Supreme Court held in relevant part that imposition of the upper term does not violate a defendant's Sixth Amendment jury trial right "so long as one legally sufficient aggravating circumstance has been found to exist by the jury," or "has been admitted by the defendant." A companion case, *People v. Sandoval* (2007) 41 Cal.4th 825, established that the erroneous imposition of an upper term is subject to federal harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18.

23

While this appeal was pending, Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567) amended section 1170, subdivision (b), providing that a trial court may impose an upper term sentence only where there are aggravating circumstances that justify the imposition of a term exceeding the middle term and the defendant has either stipulated to the facts underlying those circumstances or those facts have been found true beyond a reasonable doubt. (§ 1170, subd. (b)(1)-(2); Stats. 2021, ch. 731, § 1.3, effective Jan. 1, 2022.) In making this determination, the "court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (§ 1170, subd. (b)(3); Stats. 2021, ch. 731, § 1.3.) "These amendments apply retroactively to [defendant] because his conviction was not final when this legislation took effect." (*People v. Flores* (2022) 75 Cal.App.5th 495, 500.)

Applying these principles in this case, we find that defendant's Sixth Amendment right to a jury trial on the aggravating circumstances was not violated. However, we cannot say the same for the statute as amended by Senate Bill 567. (See e.g., *People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1114-1115.) Thus, we agree with the parties that defendant is entitled to the ameliorative provisions of the newly amended statute. (See *In re Estrada* (1965) 63 Cal.2d 740, 742.) We also agree with defendant that he is entitled to a new sentencing hearing in light of these legislative changes.

We first conclude that the imposition of the aggravated upper term does not violate defendant's right under the Sixth Amendment to the United States Constitution to have " 'any fact that exposes a defendant to a greater potential sentence . . . found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence.' " (*People v. Sandoval, supra*, 41 Cal.4th at p. 835.) In this case, two of the factors relied upon by the court were proven beyond a reasonable doubt when the jury found true the allegation that defendant personally used a firearm and that he was engaged in violent conduct. (See Cal. Rules of Court, rule 4.421(a)(2);

24

§ 667.5, subd. (c)(8) [defining a violent felony, in part, as "any felony in which the defendant uses a firearm which use has been charged and proved as provided in subdivision (a) of Section 12022.3, or Section 12022.5 or 12022.55"].) Accordingly, we have no constitutional concerns with defendant's upper term sentences. (See *People v. Black, supra*, 41 Cal.4th at p. 812 ["as long as a single aggravating circumstance that renders a defendant *eligible* for the upper term sentence has been established in accordance with the requirements of *Apprendi* [*v. New Jersey* (2000) 530 U.S. 466] and its progeny, any additional factfinding engaged in by the trial court in selecting the appropriate sentence among the three available options does not violate the defendant's right to jury trial"].)

Yet here the court relied upon additional factors that were not admitted by defendant, proven through certified records of conviction, or found true beyond a reasonable doubt by a jury. (§ 1170, subd. (b).) In addition to relying on prior convictions, the court relied on the aggravating circumstances of defendant's behavior involving the threat of great bodily injury, acts disclosing a high degree of cruelty, viciousness and callousness and defendant having multiple "significant" prior convictions. As such, consideration of these other factors was improper under the newly amended statute.

Because the trial court erred under state law, we find the harmless error test in *People v. Watson* (1956) 46 Cal.2d 818, applies. (*People v. Epps* (2001) 25 Cal.4th 19, 29.) That test is whether, " 'after an examination of the entire cause, including the evidence,' [the reviewing court] is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, at p. 836; see also Cal. Const., art. VI, § 13; *People v. Zabelle, supra*, 80 Cal.App.5th at p. 1112.) As applied here, this requires a two-step analysis. First, we start by asking whether there is a reasonable probability that the facts underlying the improperly determined aggravating circumstances would have been

25

established in a statutorily permissible manner, most notably, found true beyond a reasonable doubt if submitted to a jury, or court in a court trial. (*Watson*, at p. 836; § 1170, subd. (b)(2).) Then, excluding any factors we cannot conclude would have been found true in a permissible manner, we examine the entire cause to see whether it is reasonably probable that the trial court would have imposed a more favorable result, i.e., a more lenient sentence. (See *People v. Price* (1991) 1 Cal.4th 324, 492 ["When a trial court has given both proper and improper reasons for a sentence choice, a reviewing court will set aside the sentence only if it is reasonably probable that the trial court would have chosen a lesser sentence had it known that some of its reasons were improper"], superseded by statute on other grounds as stated in *People v. Hinks* (1997) 58 Cal.App.4th 1157, 1161-1165.) A reasonable probability of a more favorable result exists where the improper factor was determinative for the sentencing court or where the reviewing court cannot determine whether the improper factor was determinative. (*People v. Avalos* (1984) 37 Cal.3d 216, 233.)

After an examination of the record, we cannot determine whether the improperly considered factors were determinative in the trial court's selection of the upper term sentence in this case, and conclude that the matter must be remanded for resentencing.

Here, the court imposed the upper term of imprisonment based, in part, on defendant's recidivism. Although the People note that one prior conviction was admitted by defendant at trial, that prior was used as an element of the offense of being a felon in possession of a firearm and cannot be used again to impose an aggravated term. (See Cal. Rules of Court, rule 4.420(b); *People v. Edwards* (1976) 18 Cal.3d 796, 800.) As to defendant's other prior convictions, no certified records of conviction were introduced to prove the existence and number of prior convictions, and the other factors relating to a qualitative assessment of his recidivism (i.e., the frequency and significance of prior offenses) were not submitted to a jury. While there may be a reasonable probability that defendant's prior convictions would be proven in a statutorily permissible manner, we

need not decide the issue because the remaining aggravating circumstances at issue in this particular case rest on a somewhat vague or subjective standard and we find it difficult to conclude with confidence that, had the issues been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court.

By example, one circumstance relied on by the trial court was that defendant's actions posed a threat of great bodily injury and disclosed a high degree of cruelty, viciousness and callousness. (See Cal. Rules of Court, rule 4.421(a)(1).) The fact that the jury found the allegation that defendant inflicted great bodily injury not true does not provide the requisite certainty on that point. Therefore, we cannot conclude there is a reasonable probability that the jury would have found this circumstance true beyond a reasonable doubt.

We also cannot conclude that there is a reasonable probability that a jury would have found true beyond a reasonable doubt that defendant's prior convictions were "significant" enough to impose the upper term. Defendant's record reflects four prior felony convictions, including the one admitted during each trial, and two misdemeanor convictions. While we are mindful that the jury's assignment of culpability in the instant cases could reflect an increase in seriousness, it would be speculation as to whether the jury thought defendant's priors fit the undefined designation of "significant." In light of such, we cannot conclude that the jury would have found this aggravating factor true beyond a reasonable doubt.

What remains is an examination of whether there is a reasonable probability that defendant would have received a more lenient sentence based on his being armed with a weapon and committing a violent felony. The record does not clearly indicate that the trial court weighed these permissible factors more heavily than the factors it impermissibly considered. Stated differently, the record does not disclose that the trial court would have exercised its discretion to impose an upper term sentence based only on the permissible aggravating factors. Because we cannot conclude that the trial court

27

would have selected an upper term sentence based only on these factors, we find remand is necessary to allow the trial court to exercise its discretion consistent with the recent amendments to section 1170. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "].)

# V

## *Remaining Sentencing Issues*

Defendant raises three additional arguments relating to sentencing. In light of our conclusion that defendant is entitled to a full sentencing hearing on remand, we need not address these issues. On remand, defendant is not prohibited from filing a sentencing memorandum; arguing for a lower term on the assault with a firearm and the firearm enhancement; and/or advocating for concurrent sentences.

Defendant may also advocate for relief from fines and fees. To that end, we note that Assembly Bill No. 1869 (2019-2020 Reg. Sess.) now operates to "eliminate the range of administrative fees that agencies and courts are authorized to impose to fund elements of the criminal legal system." (Assem. Bill No. 1869 (2019-2020 Reg. Sess.) Stats. 2020, ch. 92, § 2, eff. Sept. 18, 2020, operative July 1, 2021.) We further note that the court operations assessment and the criminal conviction assessment fee are mandatory and, when imposed, must be included in the oral pronouncement of the sentence. (§ 1465.8; Gov. Code, § 70373; *People v. Woods* (2010) 191 Cal.App.4th 269, 272-273; *People v. Knightbent* (2010) 186 Cal.App.4th 1105, 1112.)

## DISPOSITION

The case is remanded and the trial court is directed to resentence defendant consistent with section 1170.  The judgment is otherwise affirmed.


                                             /s/

                                        EARL, J.


We concur:


/s/

DUARTE, Acting P. J.


/s/

HOCH, J.

29